ONTARIO HYDRO, a corporation continued by the Power Corporation Act, Revised Statutes of Ontario, 1980, Chapter 384, as amended by 1981, Chapter 16 and 41, Plaintiff,

v.

ZALLEA SYSTEMS, INC., a foreign corporation, also known as Zallea Brothers, Inc., and Zallea Foundation, a Delaware Corporation, Defendants.

ZALLEA SYSTEMS, INC., Defendant and Third-Party Plaintiff,

v.

LUMMUS COMPANY CANADA LTD., a Canadian Corporation, the Lummus Company, a Delaware Corporation, and Lummus Group, Inc., a Delaware Corporation, Third-Party Defendants.

Civ. A. No. 82–666.

United States District Court,
D. Delaware.

Aug. 3, 1983.

E. Dickinson Griffenberg, Jr., Robert K. Payson and John E. James of Potter, Anderson & Corroon, Wilmington, Del., for plaintiff.

Edmund N. Carpenter, II, R. Franklin Balotti and Neil B. Glassman of Richards, Layton & Finger, Wilmington, Del., for defendants and third-party plaintiff.

## OPINION

LATCHUM, Chief Judge.

This is a diversity action brought by Ontario Hydro, a corporation established and continued under the laws of the Province of Ontario, Canada ("Hydro") against Zallea Systems, Inc., a New York corporation doing business in the State of Delaware, formerly known as Zallea Brothers, Inc., and Zallea Foundation, a Delaware corporation (collectively "Zallea"). The complaint (Docket Item ["D.I."] 1) asserts twelve counts against Zallea in connection with Zallea's agreement to sell to Hydro certain expansion joints which were to be used in the construction of a heavy water facility being built in Ontario, Canada. Hydro seeks compensatory, consequential and incidental damages of one hundred ten million dollars, together with interest and costs for Zallea's alleged breach of contract for sale of goods (Counts I & II), breach of implied warranty of quality fitness and for particular purpose (Counts III & IV), negligence in failing to inform Hydro of the expansion joint's dangerous condition (Count V), negligence in design, fabrication, production, inspection and testing of the joints (Counts V through XI), and strict product liability for defective design and workmanship (Count XII).[1]

■ Zallea has moved to dismiss the Counts I through XI on the ground those counts are barred by the applicable statute of limitations. (D.I. 15.) Because it has been necessary in determining Zallea's motion to refer to specific dates and to the exact terms of the contracts for sale which did not appear in the complaint but which were revealed in the affidavit of Robert A. Grunau and exhibits thereto (D.I. 27), and the affidavit of Edmund F. Hunt (D.I. 20), the motion to dismiss Counts I through XI will be treated as a motion for summary judgment as required by Rule 12(b), Fed.R. Civ.P.

## I. FACTS

The undisputed material facts may be summarized as follows.[2] Hydro, one of the largest electrical utilities in Canada, provides virtually all the electric power in the Province of Ontario. (D.I. 1, ¶ 4.) About 1962, Hydro began a construction program designed to develop a large nuclear power generating complex along Lake Huron and one of the facilities in the complex was to serve the heavy water requirements of the nuclear generating program. (D.I. 1, ¶¶ 5–7.) In May 1974, Hydro and Zallea entered into two contracts whereby Zallea agreed to manufacture and deliver forty expansion joints (comprising two different types of joints) for use in the construction of the heavy water plant. (D.I. 1, ¶ 9.) The two contracts in question were represented by two purchase orders. (Id.) The purchase orders contained in paragraph 26 of the Contract Standard the following clause pertaining to the corrections of defects:

---

1. Hydro does not oppose Zallea's motion to dismiss Count XII, the strict liability claim (D.I. 15), on the ground that it fails to state a claim upon which relief can be granted (D.I. 26, p. 1 n), and therefore Count XII will be dismissed.

2. For the purposes of the present motion, the Court has accepted all the factual allegations of the complaint as true.

If at any time up to twelve (12) months after the date of Acceptance of the Equipment by the Engineer, any defect or deficiency should appear due to faulty workmanship, material or design, or if the Equipment or any part thereof fails to meet the requirements of the Contract, the Company shall restore the Equipment to satisfactory operating condition by making good every such defect, deficiency or failure without cost to the Commission.. The Company shall pay all freight charges for parts and/or Equipment both ways between the Company's factory or repair depot and the delivery point. The costs of transporting the Equipment both ways between the delivery point and the site will be borne by the Commission. Where supervision was called for in the Contract, similar supervision shall be provided without cost to the Commission for removing, transporting and re-installing the Equipment at the site. Any part of the Equipment made good under this Section shall be subject to all the provisions of this Section for a further period of twelve (12) months from the date when the same has been made good as aforesaid.

(D.I. 27, Ex. A, p. 26.)

Zallea was aware that these joints were to be used for piping in which pressurized hydrogen sulfide ("$H_2S$") circulates. (D.I. 1, ¶¶ 12, 16.) Zallea delivered the various expansion joints between 1976 and 1979. (D.I. 1, ¶ 15.) On approximately October 8, 1978, some $H_2S$ was released at the plant because of a failure in the weld of one of the expansion joints. (D.I. 1, ¶ 18.) Thereafter, from October 8, 1978 through February, 1980, other failures of the expansion joints occurred. *Id.* As a result, Hydro investigated these failures and discovered:

that virtually all of the expansion joints supplied by Zallea from 1976 through

1979 for use in [the Hydro plant] were defective due to faulty design, fabrication, production, inspection and testing, and faulty workmanship by Zallea, including but not limited to improper welding, failure to comply with specifications, improper testing and inspection practices, and improper fabrication and assembly.

(D.I. 1, ¶ 18.)

Hydro alleges that these defects were "inherently undiscoverable" prior to use of the expansion joints. (D.I. 1, ¶ 19.) From October 8, 1978 through February, 1980, Zallea unsuccessfully attempted to correct the defects. (D.I. 1, ¶ 21.) As a result, Hydro alleges, full use of its plant was delayed from October 8, 1978 until June, 1981, resulting in "extensive monetary damage to Ontario Hydro by virtue of the resulting loss of revenue, damage to the facility, loss of use of the facility, corrective actions taken, and design and installation of" an alternate pipe system. (D.I. 1, ¶¶ 22 & 23.) On October 7, 1982, Hydro commenced the present action in this Court. (D.I. 1.)

## II. THE BREACH OF CONTRACT FOR SALE AND BREACH OF WARRANTY CLAIMS

■ Zallea contends that with respect to Hydro's breach of contract for sale and breach of warranty. claims set forth in Counts I through IV, the Delaware four year statute of limitations, 6 *Del.C.* § 2–725, applies and that the statute began to run upon Zallea's tender of delivery of the expansion joints to Hydro. Since the tender of delivery of all the joints was completed on July 18, 1978 (D.I. 27, ¶ 14),[3] Zallea contends that the four year limitation period had expired before this suit was filed on October 7, 1982.

Hydro counters these arguments by contending that the six year Ontario statute of

---

3. The two purchase orders provided that delivery of the expansion joints would be "F.O.B. Carrier, Jobsite, Douglas Point, Ont." (D.I. 27, Ex. A, Ex. B.) Under § 2–503(2) of the U.C.C. this means that the tender of delivery did not occur until the joints were delivered to the job site in Ontario. *See* J. White & R. Summers,

*Handbook of the Law under the Uniform Commercial Code* § 6–4, at 184–85 (1972). Since actual delivery of the final shipment of the joints was made on July 18, 1978 (D.I. 27, ¶ 14), it is on this date that "tender of delivery" was completed.

limitations, Ontario Limitations Act R.S.O. 1970, c. 45(1)(g), is applicable to the contract and warranty claims because the purchase orders contained a choice of law provision that they should be interpreted in accordance with the laws of Ontario, Canada. (D.I. 27, Ex. A, p. 27, ¶ 31.) Alternatively, Hydro contends, that even if the Ontario statute of limitations does not apply, the breach of contract for sale and warranty claims accrued within the limitations period of 6 *Del.C.* § 2–725.

The Court must first determine whether to apply the Ontario or Delaware limitations period to the contract for sale and warranty claims. The purchase orders incorporated by reference the following choice of law clause:

A contract arising out of the acceptance of a tender shall be interpreted in accordance with the laws of Ontario, Canada.

(D.I. 27, Ex. A, p. 27, ¶ 31.)

Hydro, therefore, argues based on this choice of law provision, that the six year Ontario statute of limitations, Ontario Limitations Act R.S.O.1970, c. 45(1)(g), controls this case.

The Court is unable to agree with Hydro's argument. While the Court must assume the validity of the choice of law provision, it clearly appears from the language of that clause that Ontario law should only apply to an *interpretation* of the contract and not to the duration of the limitations period. While parties to a sale of goods contract are free to agree upon their own limitations period, provided the period is not extended beyond the four year code period nor reduced to less than one year, *see* 6 *Del.C.* § 2–725(1), such a limitation provision must be expressly stated. This Court cannot assume that a contract provision choosing a particular jurisdiction's laws for *interpreting* the contract also adopts that jurisdiction's statute of limitations. Accordingly, the Court cannot apply the Ontario statute of limitations on the basis of the choice of law clause.

Furthermore, in determining the applicable limitations period, this Court, guided by the *Erie* doctrine, must apply the statutes of limitations of the forum state in diversity cases. *Guaranty Trust Co. v. York*, 326 U.S. 99, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945); *see Erie Railroad Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Under Delaware law, this Court is required to apply Delaware's borrowing statute, 10 *Del.C.* § 8121, because the breach of contract for sale and breach of warranty claims occurred on the tender of delivery in Ontario, outside of Delaware. The borrowing statute in pertinent part provides:

Where a cause of action arises outside of this State, an action cannot be brought in a court of this State to enforce such a cause of action after the expiration of whichever is shorter, the time limited by the law of this State, or the time limited by the law of the state or country where the cause of action arose, for bringing an action upon such cause of action.

10 *Del.C.* § 8121.

Because Delaware's limitations period for a breach of contract for sale [4] is four years, 6 *Del.C.* § 2–725, and the Ontario limitations period is six years, the shorter four year Delaware limitations period must be applied to Hydro's breach of contract for sale and breach of warranty claims. 6 *Del.C.* § 2–725(2) provides a starting point for the Court's analysis of this issue:

A cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach. A breach of warranty occurs when tender of delivery is made, except that where a warranty explicitly extends to future performance of the goods and discovery of the breach must await the time of such performance the cause of action accrues when the breach is or should have been discovered.

*Id.*

Thus, unless a party can fit itself within the narrow exception, suit must be filed

---

**4.** 6 *Del.C.* § 2–106 provides the definition of a "contract for sale" and that definition encom-

passes the Hydro-Zallea sales transactions.

within four years from tender of delivery. While this limitation period may appear relatively short, it was designed by the drafters of the Uniform Commercial Code to serve the important function of providing a point of finality for businesses after which they could destroy their business records without the fear of a subsequent breach of contract for sale or breach of warranty suit arising to haunt them. *See* 3 W.D. Hawkland, *Uniform Commercial Code Service* § 2–725:02, at 479 (1938). As Professor Hawkland has stated, "In the usual circumstances, however, defects are apt to surface within [the 4 year] period, and the few odd situations where this is not the case, resulting in hardship to the buyer, are thought to be outweighed by the commercial benefit derived by allowing the parties to destroy records with reasonable promptness." 3 Hawkland, *supra*, § 2–725:02, at 480. Hence, the finality necessary to promote the flow of commerce is effectuated by the limitation period.

In the present case, the tender of delivery of all the expansion joints was completed on July 18, 1978, when the last of the joints had been delivered at the job site. (D.I. 27, ¶¶ 14 & 15.) Since the complaint in this action was filed on October 7, 1982, Hydro's breach of contract for sale and breach of warranty claims were untimely filed unless there is a warranty of future performance contained in the purchase orders.

Hydro contends that this exception does apply and argues that the correction of defect clause (D.I. 27, Ex. A, p. 26), quoted above constitutes a warranty of future performance. The Court, however, is unable to agree. There is a vast difference between a warranty of future performance and a repair or replacement warranty because the latter will not have any effect upon the § 2–725(1) limitation period. *See Owens v. Patent Scaffolding Co.,* 14 U.C.C. Reporting Service 610, 616–17 (N.Y.Sup.Ct.1974).

A warranty of future performance of a product must expressly provide some form of guarantee that the product will perform in the future as promised. The U.C.C. provides the exception in § 2–725(2) because without it, a situation could arise where a buyer, after tender of delivery, could be awaiting such future performance only to have the four year limitation period expire and the future performance promised subsequently fail to occur, thereby leaving the buyer without legal recourse upon such an expressed warranty.

On the other hand, a repair or replacement warranty does not warrant how the goods will perform in the future. Rather, such a warranty simply provides that if a product fails or becomes defective, the seller will replace or repair within a stated period.

Thus, the key distinction between these two kinds of warranties is that a repair or replacement warranty merely provides a *remedy* if the product becomes defective, while a warranty for future performance *guarantees the performance* of the product itself for a stated period of time. In the former case, the buyer is relying upon the warranty merely as a method by which a defective product can be remedied which has no effect upon his ability to discover a breach. In the latter instance, the buyer is relying upon the warranty as a guarantee of future performance and therefore has no opportunity to discover the breach until the future performance has been tested.

From a reading of the correction of defect clause in the present case, the Court concludes that the clause constitutes a repair warranty and not a warranty for future performance. Nowhere in this clause does Zallea warrant how the expansion joints will perform in the future. Rather, the clause provides a remedy for repair within one year of the Engineer's acceptance of the equipment if the expansion joints are defective.[5] Thus, this correction

---

**5.** Hydro also argues that their Engineer never "accepted" the expansion joints. (D.I. 26, pp. 52–55.) However, whether or not the joints were accepted by Hydro's engineer is irrelevant because the correction of defect clause in the contracts was not a warranty of future per-

of defect clause has no effect upon the running of the four year limitation period after tender of delivery is made.

Hydro also contends there was never a proper tender of delivery and that therefore the limitations period of § 2–725 has never expired. This argument is based on the technical reading of the Code which states —"[t]ender of delivery requires that the seller put and hold conforming goods at the buyer's disposition ...." 6 *Del.C.* § 2–503(1). In this respect, the Code provides that goods are deemed to be " 'conforming' or conform to the contract when they are in accordance with the obligations under the contract." 6 *Del.C.* § 2–106(2). Thus, Hydro says that since the expansion joints were not "conforming goods" within the meaning of the contract, there never was a tender of delivery and the statute of limitations has not yet run. Hydro also points to the terms of the contract which provide for the inspection of the goods prior to acceptance and argues that the limitation period could not begin to run until Hydro inspected the goods and determined whether they conformed. Since Hydro made one such determination in April, 1979, and the other in January 1980, it argues that this lawsuit would be timely if measured from either date.

Hydro relies upon *City of New York v. Pullman,* 662 F.2d 910 (2d Cir.1981), to support this argument. In *Pullman,* the buyer contracted to purchase 754 subway cars from the defendant. The contract provided that prior to acceptance of the cars, the buyer would be permitted to test 10 of the cars for thirty days. The Second Circuit ruled that the delivery of the ten cars did not constitute tender of delivery and stated:

> The contract specifications provided that the [subway car] design would be required to pass a 30 day on-line inspection before it would "conform" to the contract requirements. Until that inspection occurred, therefore, there could be no tender of "conforming goods" within the

meaning of § 2–503(1). Moreover, under the contract appellees were not obliged to take any steps until appellants conformed to the specifications by delivering cars which had completed the 30 day test, since the contract specifically provided that any cars built before the 30 day test was completed were constructed at the seller's risk. Accordingly, tender of delivery could not occur, and did not occur until the required test of the sample train was completed ....

662 F.2d at 919.

On factual and policy grounds, this Court finds that there are enough distinctions between *Pullman* and this case to warrant different results.

From a policy standpoint, it is important to note at the outset that the phrase "tender of delivery" can have a broader meaning than the plaintiff contends. Indeed, Professor Hawkland has stated, "Occasionally, however, the term 'tender' is used in Article 2 of the UCC as an offer by the seller to deliver what he believes incorrectly to be conforming goods." 2 Hawkland, *supra,* § 2–503:02, at 645. Moreover, Comment 1 to § 2–503 states that, "at other times [the term tender] is used to refer to an offer of goods or documents under a contract as if in fulfillment of its conditions even though there is a defect when measured against the contract obligation." *Id.*

If the Court were to apply the phrase as Hydro suggests, then until the seller tenders conforming goods, the limitation period provided in § 2–725 would never apply. This would circumvent the very purpose of § 2–725, which, as discussed above, is to provide a finite period in time when the seller knows that he is relieved from liability for a possible breach of contract for sale or breach of warranty.

The *Pullman* case, however, avoids this problem because of its unique factual situation and, as a result, it should not be applied liberally to all breach of warranty cases. The parties in *Pullman* had agreed

formance but only a repair warranty which does not extend the four year limitation period

provided in 6 *Del.C.* § 2–275(1).

to a thirty-day pre-inspection period for a small percentage of the total goods. It was clear from the contract that once the thirty-day period expired and the subway cars were delivered, then the "tender of delivery" occurred and the breach of warranty statute began to run.

In the present case, there was no finite period for inspection. Moreover, the inspection clause was not directed to the tender of delivery aspect but rather to Hydro's right to reject the goods once they were delivered, for the clause focuses not on delivery but on the preservation of Hydro's right to reject after full delivery. The clause in *Pullman* constituted a pre-delivery inspection, while the clause in question in this case more closely resembles a post-delivery inspection.

Therefore, the Court finds, as a matter of law, that the tender of delivery occurred when, in accordance with the purchase orders, the expansion joints were delivered to the job site at Douglas Point, Ontario. (D.I. 27, Ex. A, p. 1.) Because such deliveries were completed on July 18, 1978, more than four years before this suit was brought, Hydro's contract and warranty claims (Counts I through VI) are time-barred.

## III. THE NEGLIGENCE CLAIMS

[12] Zallea also contends that the negligence claims alleged in Counts V through XI are time-barred by the Delaware three-year statute of limitations,[6] 10 *Del.C.* § 8106, because the claims accrued at the time of manufacture or at the latest upon completion of the tender of delivery of all joints at the job site, both of which events occurred more than three years before this suit was brought. Hydro, relying upon the "time-of-discovery" doctrine, counters that the negligence claims did not accrue until April, 1979 and January, 1980, when it be-

came aware that Zallea could not repair the two different types of expansion joints.

The general and well-settled law of Delaware is that tort actions accrue under 10 *Del.C.* § 8106 at the time of the occurrence of the wrongful act, and that the statute of limitations begins to run from that date, and ignorance of the cause of action, absent affirmative concealment or fraud,[7] is no obstacle to the operation of the limitation period.

The seminal case in Delaware is *Mastellone v. Argo Oil Corp.,* 46 Del. 102, 82 A.2d 379 (1951). In that case, the plaintiff's stock was wrongfully but not fraudulently converted on defendant's records when a replacement certificate was issued to another person. Plaintiff did not learn of the conversion of his stock until more than three years later. The Delaware Supreme Court, nevertheless, held the three year statute of limitations applicable and stated:

Having decided that a conversion took place when stock certificate No. 571 was issued, we are next confronted by the contention that the Statute of Limitations, which under our law begins to run when the cause of action "accrues", does not begin to run in a situation of this kind until the person whose property has been converted has knowledge of the commission of the tort. Some principles of fairness appear at first view to commend that argument, but precedent saves us from a serious problem. It is well established in common law jurisdictions generally that ignorance of the facts is in the ordinary case no obstacle to the operation of a statute of limitations. There are, of course, certain well defined exceptions, such as infancy, incapacity, certain types of fraud, or concealment of the facts which would have disclosed the tort; but plaintiff has not pointed to any authority, and we have found none, indicat-

---

6. Both parties agree that the provisions of 10 *Del.C.* § 8106 are applicable to Hydro's claims of negligence. (D.I. 19, p. 11; D.I. 26, p. 56.) They are in dispute as to when the claims accrued. Section 8106, in pertinent part, reads as follows:

[N]o action to recover damages caused by an injury unaccompanied by force ... shall be brought after the expiration of 3 years from the accruing of the cause of action ....

7. The complaint here contains no allegations of affirmative concealment or fraud. (D.I. 1.)

ing that this case falls within any of the known exceptions to the rule....

82 A.2d at 383.

The *Mastellone* decision, and the concept enunciated therein, had and has been consistently followed by Delaware courts when applying "accrual type" statutes of limitations as found in 10 *Del.C.* § 8106. *Lembert v. Gilmore,* 312 A.2d 335 (Del.Super. 1973); *Bradford, Inc. v. Travelers Indemnity Co.,* 301 A.2d 519 (Del.Super.1972); *Howmet Corp. v. City of Wilmington,* 285 A.2d 423 (Del.Super.1971); *Nardo v. Guido DeAscanis & Sons, Inc.,* 254 A.2d 254 (Del.Super. 1969); *Green v. Loper,* 45 Del. 117, 67 A.2d 856 (1949); *Artesian Water Co. v. Lynch,* 283 A.2d 690 (Del.Ch.1970); *Leibowitz v. Hicks,* 42 Del.Ch. 209, 207 A.2d 371 (Del.Ch. 1965); *Glassberg v. Boyd,* 35 Del.Ch. 293, 116 A.2d 711 (Del.Ch.1955). In all of these cases, the Delaware courts held that actions sounding in tort accrue under 10 *Del.C.* § 8106 at the time the tortious acts were committed, and the statute of limitations began to run at that time and ignorance of the tort does not toll the statute in the absence of affirmative concealment or fraud. The tortious acts Zallea is alleged to have committed are the failure to warn of a dangerous condition (Count V), negligent design of the joints (Count VI), negligent fabrication (Count VII), negligent production (Count VIII), negligent inspection (Count IX), negligent testing (Count X), and negligence based on the theory of *res ipsa loquitur* (Count XI). All of these alleged wrongful acts accrued, from which damages are alleged to flow, prior to or during the manufacturing process of the expansion joints and at the very latest by the time their tender of delivery at the job site was completed on July 18, 1978, more than three years before suit was filed. Ignorance of the negligence did not toll the statute.

The "time-of-discovery" rule which Hydro urges here has not been generally adopted by the Courts of Delaware. It has only been applied by the Delaware Supreme Court to professional malpractice cases. *See Pioneer Nat'l Title Ins. Co. v. Sabo,* 382 A.2d 265 (Del.Super.1978), *aff'd,* 401 A.2d 68 (Del.Supr.1979); *Isaacson, Stolper & Co. v. Artisan Savings Bank,* 330 A.2d 130 (Del. Supr.1974); *Layton v. Allen,* 246 A.2d 794 (Del.Supr.1968).

In *Layton v. Allen,* 246 A.2d 794 (Del. Supr.1968), a medical malpractice case where the doctor, during an abdominal operation for correction of a hernia, left a large metallic hemostat inside the plaintiff's body, the court applied the time of discovery rule, but in doing so warned:

> We expressly limit this holding to [the facts of this case]; we do not intend any broad relaxation of the rule of ignorance as exemplified in *Mastellone;* we hold only that [10 Del.C. § 8118], as herein construed, bars the application of that rule in a case of that kind.

246 A.2d at 799.

Again the Delaware Supreme Court in *Isaacson,* considering the malpractice of an accountant, stated that the time of discovery rule is of limited application. 330 A.2d at 133. The common thread in the professional malpractice cases in which the Delaware Supreme Court has applied the time of discovery exceptions is the fact that a lay person has been injured by a professional person of superior knowledge such as a doctor, lawyer or accountant. The Delaware Supreme Court has never applied the time of discovery exception in cases against a manufacturer, builder or seller of goods in the context of a purely commercial transaction.

Indeed, the lower courts of Delaware, with one exception, have followed the *Mastellone* case and have expressly refused to apply the time of discovery exception to suits seeking damages for negligent construction or design. In *Nardo v. Guido DeAscanis,* 254 A.2d 254 (Del.Super.1969), the plaintiff on July 3, 1967, sued his contractor who had completed constructing plaintiff's house in July, 1957, for having negligently and improperly placed the roof rafters thereby causing the roof to sag in 1960 and creating a dampness problem which first occurred in 1959. The Court held that the plaintiff's negligence claim of

a sagging roof accrued in 1960 and the claim for the dampness problem accrued in 1959 which were time-barred by the three year statute of limitations. The plaintiff had argued that he had not discovered the negligent placement of the roof rafters until late 1965 or early 1966 and thus the suit was timely brought. The Court, however, held that the time of discovery exception applied by the Supreme Court in *Layton v. Allen* was limited to malpractice cases. The Court stated:

> It should be noted that the time-of-discovery rule has found application in malpractice cases and it was with respect to *such* cases that the Court addressed its seemingly favorable comments on the time-of-discovery approach. No cases have been cited showing extension of the discovery rule to breach of contract cases or to negligence cases other then [sic] those of malpractice. It would be presumptuous of this Court to extend the discovery approach to "accrual" statutes generally, particularly in a non-malpractice case.

254 A.2d at 256.

Similarly, in *Lembert v. Gilmore*, 312 A.2d 335 (Del.Supr.1973), plaintiffs on June 3, 1971, sued a surveyor who performed an inaccurate survey of their property on June 5, 1965. The inaccurate survey was not discovered by the plaintiffs until 1970. The Court held the action was barred by the three year limitations period in 10 *Del.C.* § 8106 based on *Mastellone* and refused to extend the time of discovery exception set forth in *Layton v. Allen*, 312 A.2d at 336.

Again, the problem was faced in *City of Newark v. Edward H. Richardson Associates, Inc.*, 375 A.2d 475 (Del.Super.1977). In that case, the defendant engineering firm was alleged to have negligently designed a drainage ditch and recommended the use of unsuitable construction materials. The Court held that the cause of action accrued and the three year statute of limitations began to run when defendant provided the plaintiff with the defective plans and specifications in February, 1966, and received final payment for his consulting services in February, 1967. Thus, the suit which was filed on June 1, 1976, was time-barred. The Court expressly rejected plaintiff's time of discovery argument that the cause of action accrued in July, 1975, when the drainage ditch collapsed. The Court stated:

> The *Layton* and *Isaacson* decisions did not overrule the generally accepted principle that plaintiff's ignorance of a cause of action does not affect the date on which the action accrues and does not toll the running of the statute of limitations against it. See *Mastellone v. Argo Oil Corp.*, Del.Supr. [46 Del. 102], 7 Terry 102, 82 A.2d 379 (1951); *Nardo v. DeAscanis & Sons, Inc.*, Del.Super., 254 A.2d 254 (1969); *Bradford, Inc. v. Travelers Indemnity Company*, Del.Super., 301 A.2d 519 (1972); *Lembert v. Gilmore*, Del.Super., 312 A.2d 335 (1973) and *Freedman v. Beneficial Corporation* [406 F.Supp. 917 (D.Del.1975)], *supra*. They were, rather, narrowly drawn exceptions to the general rule based upon the specific facts before those Courts—facts which are not present here.

375 A.2d at 477.

The only Delaware case holding to the contrary is *Rudginski v. Pullella*, 378 A.2d 646 (Del.Super.1977), also decided by the Superior Court just six months after the City of Newark case was decided. In the *Pullella* case, an action was brought by a homeowner against a plumbing contractor for installing a defective septic tank disposal system. The homeowner had purchased his home on August 9, 1972, which was connected to the allegedly defective septic tank disposal system but did not assert its claim for negligence until January 21, 1976, against the plumbing contractor. The Court applied the time of discovery rule and held that the three year statute of limitations did not begin to run until June, 1974, when the homeowner first experienced difficulty with the system and therefore the homeowner's claim was not time-barred. This case appears to be an aberration as it extended the Delaware Supreme Court opinion relating to professional malpractice

**1271**

suits to a construction suit despite the Supreme Court's warnings that malpractice cases were the only exception to the *Mastellone* rule of ignorance law.

Because this is a diversity case, this Court must apply the substantive law of Delaware as "declared by its legislature in statute or by its highest court in a decision." *Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938). The Delaware Supreme Court, as discussed above, has clearly held that causes of action sounding in tort accrue under 10 *Del.C.* § 8106 at the time the tortious acts were committed and the three year limitation period begins to run at that time and ignorance of the tort does not toll the statute. *Mastellone v. Argo Oil Corp., supra.* The only cases in which the Supreme Court has applied the time of discovery exception are to professional malpractice claims where the Supreme Court was careful to state that this exception was not intended to be a broad relaxation of the rule of ignorance exemplified in *Mastellone.* The Delaware trial courts have adhered to those rulings particularly in negligence claims against manufacturers, builders and sellers of goods, except for the *Pullella* case which this Court views as an aberration. Accordingly, this Court finds that under Delaware law the negligence claims asserted against Zallea accrued at the latest on July 18, 1978, when the final shipment of allegedly defective joints were delivered to Hydro at the job site. Hence, this Court holds that Hydro was injured at the latest by Zallea's alleged breach of duty to properly design and manufacture the joints when Zallea tendered delivery of the final sets of joints on July 18, 1978, more than three years before suit was brought. *City of Newark v. Richardson, supra,* 375 A.2d at 476. Under these circumstances, the negligence claims asserted in Counts V through XI are time-barred.

Alternatively, even if the Court had found the *Mastellone* rule of ignorance

to be inapplicable to this case, the Court would still find that the negligence claims were untimely brought. Hydro alleges that the first discovery of any defect in the expansion joints occurred on October 8, 1978. (D.I. 1, ¶¶ 18 & 19.) Although Zallea thereafter attempted to repair the expansion joints, this fact does not affect the running of the three year statute of limitations on tort claims under 10 *Del.C.* § 8106. This was the Delaware Supreme Court's holding in *Becker v. Hamada, Inc.,* 455 A.2d 353 (Del.Supr.1982). In that case, a roofing contractor completed a roof for a shopping mall developer in November, 1971, and was paid for his services at that time. The roof began to leak thereafter and the developer spent large sums to correct the condition between 1974 and 1976. In 1979 the developer hired an expert to determine the cause of the leaks and he informed the developer that the leaks were due to defective workmanship and materials. The developer brought suit against the roofing contractor on July 24, 1980, and alleged that the roofer breached its implied warranty of merchantability for the roofing materials and that it negligently failed to provide adequate installation instructions and to test the materials. The Supreme Court held that the negligence claim [8] was barred by the three year statute of limitations in 10 *Del.C.* § 8106 because the statute began to run as soon as the defects were discoverable before 1976. The Court ruled that even though the developer did not "pinpoint the exact cause of the leaks until 1979," the developer was aware that the roof had recurrent problems between 1974 and 1976 and the defects were then discoverable. Because suit on the negligence claims was brought more than three years later it was time-barred. 455 A.2d at 356.

Thus, alternatively applying the rationale of the *Becker* case to the instant suit, the Court must conclude that the negligence claims are barred. Here, when the pipe joint leaked on October 8, 1978, releasing

---

8. The Supreme Court also held that the warranty claim was barred by the four year limitation period, provided in 6 *Del.C.* § 2–725,

which accrued in 1972 when the roof was completed. 455 A.2d at 356.

hydrogen sulfide because of defective welds, Hydro was put on sufficient notice to make a diligent inquiry, which if promptly pursued would have led to the discovery of the defects. Since Hydro did not bring suit on the negligence claims within three years after the leak, which occurred on October 8, 1978, even under the time of discovery rationale, these causes of action were not timely filed.

## IV. ESTOPPEL

Hydro argues in its brief that if the Court finds the action untimely, "Zallea should be estopped from asserting any statute of limitations as a bar to these counts because of its conduct that affirmatively mislead and induced Hydro to delay prosecuting its action against Zallea." (D.I. 26, p. 64.) Hydro continues to contend that "it was led to believe by Zallea that Zallea would cure the expansion joint defects that resulted from Zallea's negligence and breach of warranty in the manufacture of those expansion joints," (*id.* pp. 64–65), and that therefore "Hydro was relying upon Zallea's compliance with the correction of defect clause and had no reason to believe that Zallea had breached its contract." (*Id.* p. 76.)

 The Court concludes that the doctrine of estoppel does not prevent Zallea from defending on the basis of the statute of limitations because a promise to repair defective goods does not preclude the running of applicable limitation periods. Hydro's argument for applying estoppel was raised in *DiBiase v. A & D, Inc.,* 351 A.2d 865 (Del.Super.1976). In that case, the defendants had constructed a garage for the plaintiffs which began to develop cracks in 1970, shortly after construction. The defendants twice attempted repairs and reassured the plaintiffs of the soundness of the structure before disclaiming liability in 1972. The Court rejected plaintiffs' argument that the statute of limitations period should not begin to run until the date of defendant's disclaimer. To this argument, the Court stated:

Plaintiffs had a very substantial time after defendants' disclaimer to bring any action before the statute ran from the date of settlement. *Nowell [v. Great Atlantic & Pacific Tea Co.,* 250 N.C. 575, 108 S.E.2d 889 (1959)] had a last minute promise which induced plaintiffs' delay, and in *State Farm Mutual Automobile Insurance Co. v. Budd,* 185 Neb. 343, 175 N.W.2d 621 (1970), the defendant was estopped to plead the statute where he had tricked plaintiff until the last minute into believing all responsibilities would be honored.

The statute of limitations must have some significance. It should not be easily emasculated. Plaintiffs show no special circumstances in these two counts that would excuse the bar on estoppel grounds. Consequently, the statute must apply.

351 A.2d at 869.

 Likewise, in the present case, Hydro has failed to allege any special circumstances to estop the application of the statute of limitations. Although Hydro argues in its brief that Zallea "affirmatively mislead and induced Hydro" to delay the filing of this suit (D.I. 26, p. 64), the complaint contains no factual allegations with sufficient specificity to indicate that Zallea in fact affirmatively acted to mislead and induce Hydro from bringing suit. While the purchase orders contained a warranty to repair, this alone does not constitute affirmative acts intended to mislead or induce Hydro from suing.

Moreover, Hydro contends that the application of estoppel would prevent the accrual of the cause of action relating to the two types of expansion joints until April, 1979 and January, 1980, when Zallea ceased in its attempts to repair. (D.I. 26, p. 78.) But as in *DiBiase,* this still left Hydro with sufficient time to file suit within the limitations period. The situation is not like those in *Nowell* or *Budd,* cited in the *DiBiase* opinion, where the defendants made promises to plaintiff up to the last minute of the limitations period in order to induce delay in filing suit. The Court, therefore, concludes

that estoppel should not be applied to preclude Zallea from asserting the statute of limitations defense to Hydro's claims.

## V. CONCLUSION

The Court will therefore dismiss Count XII because Hydro does not oppose this motion and will grant summary judgment in favor of Zallea on all the remaining Counts (Counts I through XI).

An Order will be entered in accordance with this Opinion.