No. 14,165.

HOLLY SUGAR CORPORATION *v.* WILSON.
(75 P. [2d] 149)

Decided December 20, 1937.   Rehearing denied January 17, 1938.

Messrs. Blount & Silverstein, Mr. Victor W. Hungerford, for plaintiff in error.

Mr. E. H. Stinemeyer, Mr. Charles M. Rose, for defendant in error.

*En Banc.*

Mr. Justice Hilliard delivered the opinion of the court.

An action by A. E. Wilson to recover from the Holly Sugar Corporation the value of shares of its preferred stock owned by him, and accumulation of dividends thereon. Recovery was adjudged.

It appears that November 4, 1916, Wilson, a long time resident of Canon City, purchased twenty shares of the corporation's preferred stock, and in evidence of his purchase received certificates in that number of shares previously issued to another, duly assigned; that November 8, 1916, upon surrender of the assigned certificates, the corporation issued and delivered to Wilson four new certificates, each for five shares of its preferred stock; that October 24, 1934, Wilson sold the stock and made formal assignment of his certificates, which were tendered at once to the corporation for reissuance to the purchaser; but the corporation denied Wilson's ownership, refused to make transfer, and retained and "cancelled" the certificates; that although from the inception of Wilson's ownership of the stock, dividends had been declared from time to time, the corporation had neither

paid nor advised him of dividends, and he was not otherwise apprised thereof. In manner and detail of acquirement of the stock, Wilson availed himself of the services of an official of the First National Bank of his city, who not infrequently gave attention to such matters; that in furtherance of the purchase the banker corresponded with Wilson, Cranmer and Company, of Denver, a stock brokerage firm, and a participant in underwriting the preferred stock issue of the corporation, from which he was accustomed to get service of the nature demanded; that the Wilson-Cranmer company secured certificates of stock in the desired number of shares, and with sight draft in the sum of the transaction attached, sent them to the Canon City bank, and the draft was paid; that thereupon the bank forwarded the assigned certificates to the Columbia Trust Company, of New York, the corporation's transfer agent, for transfer to Wilson, the transfer was made, and the new certificates were sent to the forwarding bank; that upon receipt of the certificates evidencing Wilson's ownership of the stock, the bank delivered them to him and his possession continued until the incident of October 24, 1934, already related.

It further appears that in sums equal to the several dividends declared upon Wilson's stock from the inception of his ownership to September, 1924, the corporation made remittance to one A. E. Wilson, of Denver, who formally concedes, as does the corporation, that he never was the owner of the stock, or entitled to dividends thereon; that at the time last mentioned, the Denver Wilson presented to the corporation his affidavit to the effect that he was the owner of the stock and had lost his certificates, whereupon the corporation issued new certificates to him, but of this the Wilson of Canon City was not aware until October, 1934; that from September, 1924, the corporation ignored the existence of the certificates it had issued to the Wilson here, and which he still held and owned, made its declaration of dividends on the certificates it had issued to the A. E. Wilson of Denver,

and paid them to him until he assigned the certificates, and subsequently to his successors. The Denver Wilson, thus enriched, was the Wilson of the Denver brokerage firm through whose instrumentality the Canon City Wilson purchased the stock in 1916. It is pertinent to add, that until October, 1934, when the corporation refused to transfer the stock represented by the Canon City Wilson's certificates, neither of the two men, bearing the identical name—A. E. Wilson—knew, or knew of, the other, and that at no time, or in any manner whatsoever, did the Canon City Wilson do aught that was calculated to lead the corporation management to believe that the stock represented by the certificates he held, belonged to the Denver Wilson.

Judgment entered for $4,509.38, based on items—computations not questioned—as follows: $1,905, paid by Wilson for twenty shares of the stock which he was obliged to buy in the open market in fulfillment of his obligation to the purchaser of his stock, when the corporation refused to transfer the stock represented by the certificates presented for that purpose; $2,030, the sum of the dividends declared prior to October 24, 1934, the date of its conversion by the corporation, and $574.38, as interest.

The corporation contends: (1) That Wilson's loss was occasioned by his negligence and that of the Canon City bank official, said to be his agent, and through whom he made purchase of the stock, in that, as said, there was failure to advise the corporation that he was the purchaser and that he was the person to whom the certificates were issued by the transfer agent, and in failing thereafter, for eighteen years, to acquaint the corporation with the fact that he was in possession of the certificates and claimed to be the owner thereof; (2) that Wilson slept on his rights from November, 1916, to October, 1936, or nearly twenty years, hence was guilty of laches; (3) that since Wilson did not commence action until October, 1936, more than six years after his cause

516

of action accrued, he is precluded by the bar of the six
year statute; (4) that in any event, his action is barred
by the same statute as to dividends declared and payable
prior to six years before the commencement of his action;
(5) that the law and equity favor the corporation, in that
it acted innocently and was less responsible than Wilson
for the damages he suffered; (6) that Wilson's cause of
action, if any, is against the Denver A. E. Wilson.

From nothing appearing, as we perceive, may negli-
gence be attributed to Wilson. He bought the stock and
paid for it. He received the certificates issued in evi-
dence of his purchase and ownership, and placed them in
his safe-deposit box, "as" to quote the learned trial
judge, "he had a right to do." He kept them there until
the time in October, 1934, when, in attempted consum-
mation of a sale he had made of the stock, he caused his
certificates to be tendered to the corporation with direc-
tions for transfer, with the result already stated. Noth-
ing more, we think, was required of him. At the time of
the purchase, and for many years immediately preceding,
Wilson had lived in Canon City. His desire to secure the
stock was communicated from his home city, through a
prominent bank there, and the entire correspondence in
relation thereto—sent and received—was through that
medium. The final communication was from the corpora-
tion's authorized transfer agent to the Canon City bank,
and therewith was transmitted the certificates, which
continuously thereafter were in Wilson's possession.

Whatever of discomfiture there was, finds predicate,
as we think, in the carelessness of the corporation's
transfer agent. If the assumption were indulged that on
receipt of Wilson's certificates, the Canon City bank
did not forward his address, as claimed, still this was
not justification for the acts of the corporation and its
agent. As to two other purchasers of like stock, con-
summated in the same manner, at the identical time, and
through the same bank and correspondence, the transfer
agent, almost immediately following its shipment of the

certificates to the bank, made inquiry of the bank as to their addresses; but no such inquiry was made as to Wilson's address. Instead, the transfer agent, acting on a postulate premised solely on the acquaintanceship of its manager with A. E. Wilson, of Wilson-Cranmer, Denver, at once caused its records to show that that gentleman was the owner of the certificates in question, and communicated its erroneous conclusion to the corporation, which, making no direct inquiry, proceeded to regard Wilson of Denver as owner of the stock, sent notice of and paid dividends to him, and ultimately issued new certificates to him, all as we have seen. The Denver Wilson, as witness for the corporation, addressing himself to the "mystery," said in his deposition: "I have talked to a lot of brokers about this thing and I have never found a parallel yet with it. The whole story is a mistake by the Columbia Trust Company, because I had been a stockholder and they just automatically put in my name." We agree that the mistake may have had genesis as suggested, but it was a mistake nevertheless, and founded on a false premise, carelessly assumed by the transfer agent.

But, since at any time through the years, defendant argues, Wilson could have inquired of the corporation concerning his stock, as to its value, whether dividends had been declared, or whatever, his failure to do so is equivalent to negligence, which should work his undoing. We do not so regard it. He owned the stock and held the certificates issued to him. His possession was a continuing affirmation of ownership and his power over the stock, until withdrawn or surrendered in lawful manner. *Holbrook v. New Jersey Zinc Co.,* 57 N. Y. 616.

The certificates were transferable only upon surrender duly endorsed. They were not endorsed and offered for transfer until 1934, when the corporation immediately converted them. Until then Wilson neither knew, nor had cause to suspect, that the corporation

518

regarded some other as the owner of his stock. He was not put upon inquiry. The fact that the man mistakenly chosen by the corporation to enjoy ownership of his stock was of like name, is without legal significance. Wilson, an elderly man, and for years residing largely in retirement in California, testified that he put the certificates in his safe-deposit box in the Canon City bank and forgot them. ''If other stocks I had was paying dividends,'' he said, ''they sent the dividends; but the Holly Sugar didn't send any, and I supposed they wasn't making any money.'' His attitude, throughout, as our study convinces, was consistent with the belief he professed. Upon sale of his stock, the only demand he made was that it be transferred to the purchaser. Nothing was said of dividends. Out of the refusal of the corporation to allow transfer of the stock, and the investigation provoked thereby, and not otherwise, or before, did Wilson learn the corporation assumed that another owned his stock, and that it had declared dividends from time to time and paid them to such other. That reasonably, in the circumstances appearing, he might have thought to make inquiry about his stock, but did not so inquire, should not, we think, be held to work absolution of the corporation for its ill-advised act of conversion.

There is no basis, we think, for the claim advanced, that the bank official (deceased before trial) who carried on the correspondence at the time Wilson purchased the stock, represented him in such sense that knowledge by him of declaration of dividends on like stock, may be imputed to Wilson. If the banker knew the fact—only assumed—there was no evidence that he communicated it to Wilson.

In the circumstances here, the element of time, emphasized in the contention under consideration, does not operate adversely to Wilson. See *Cleveland, etc., R. R. Co. v. Robbins*, 35 Ohio St. 483.

2. If we were to accept the premise that Wilson ''slept upon his legal and equitable rights from Novem-

ber 4, 1916 [the date he purchased the stock], to October 21, 1936 [when his complaint was filed], a period of nearly twenty years," as urged by the corporation, the point that laches obtained would be potent. But when we consider that within a few days after Wilson bought the stock, formal certificates in evidence of his ownership were issued and delivered to him, and that his possession continued unchallenged until October 24, 1934, when the corporation, entrusted with custody of the certificates for the purpose of stock transfer, converted them, we are disposed to the view that not until then was there occurrence requiring him to move in behalf of his rights, to which, within reasonable time, and well within the statute, he addressed himself. "It follows that, if lapse of time can bar an action in such a case, it did not begin to run, under the statute of limitations or the doctrine of laches, until the company repudiated the relation, claimed the stock adversely, and brought the repudiation and claim to the knowledge of" Wilson. *Mountain Water Works Co. v. Holme,* 49 Colo. 412, 113 Pac. 501.

■ ■ 3. What we already have said is in point here. It is true that in 1924, the corporation, basing its action on a verified, but admittedly untrue, claim that another than Wilson owned the stock in question, assumed to "stop" his certificates and issued new ones to the false claimant; but of this no formal notice was given Wilson at any time, and he learned of it first, and simply as an incident, when the corporation converted his stock in 1934. "A corporation is a trustee for its stockholders, and is bound to protect their interests. * * * It holds its property as trustee for its stockholders. * * * A stockholder has the right, therefore, to rely upon the fact that the corporation will preserve his right to his stock, and to presume that it will not assert an adverse claim to it." *Mountain Water Works v. Holme, supra.* A corporation proceeding to transfer stock "in the absence of the original certificate," as here, does so "at its peril, and the real owner of the stock, evidenced by such

520

certificate, loses nothing thereby.'' *Supply Ditch Co. v. Elliott,* 10 Colo. 327, 15 Pac. 691. In the circumstances of the record, Wilson's ownership of the stock was un-affected by anything done by the corporation prior to its formal acts of conversion in 1934. It follows that his action begun in 1936 was in time.

■ ■  4. We do not think the statute of limitations may be interposed as to dividends declared on Wilson's stock and not paid. That the stock was preferred, and the certificates contained a provision to the effect that before dividends can be declared and paid on common stock, dividends at a certain rate shall be paid on the preferred stock, is not sufficient, in the circumstances of the record, to warrant a different conclusion. Certifi-cates evidencing the preferred stock, while definitely providing dividends as to rate, made no provision as to time when there should be declaration and payment. As already noted, not until October, 1934, was Wilson ad-vised that dividends had been declared upon his stock, and his demand therefor was of December 15, 1934. ''The trusteeship of a corporation for its stockholders is that of an acknowledged and continuing trust. It can not be regarded of a different character. It arises out of the contractual relation whereby the corporation acquires and holds the stockholder's investment under express recognition of his right and for a specific purpose. It has all the nature of a direct trust, to which, it is gen-erally held, statutes of limitation have no application until there is a clear and unequivocal disavowal of the trust and notice of it brought to the cestui que trust. * * * There can be no substantial difference between the trusteeship of a corporation as it relates to the stock of a shareholder and its duty to him in respect to the profits or dividends upon his stock. He is under no obligation to draw or demand his dividends within any prescribed period. He may leave them with the corpo-ration if he chooses, and be under no default. The debt which a declared dividend creates on the part of a corpo-

ration to the stockholder, is one payable only on demand as is the obligation of a bank to its depositors. It is not subject to limitation until there has been a demand upon the corporation and a refusal to pay." *Yeaman v. Galveston City Co.*, 106 Tex. 389, 167 S. W. 710. See, also, *Owingsville, etc., Co. v. Bondurant's Admr.*, 107 Ky. 505, 54 S. W. 718. The Kentucky case was cited by us in *Mountain Water Works v. Home, supra.*

5. Neither law nor equity, as we are persuaded, favors the corporation. Out of the relationship between it and Wilson, that of trusteeship, it owed him fealty, of which it was not observant.

6. That Wilson should be relegated to an action against Wilson of Denver, as suggested in this assignment, is untenable. The corporation, not the other Wilson, converted Wilson's stock and dividends.

The trial court, patient and painstaking, apprehended the controlling rules and resolved in full light. Let the judgment be affirmed.