AMEDEO MASTELLONE, Plaintiff-Below, Appellant, v. ARCO OIL CORPORATION, a corporation of the State of Delaware, Defendant-Below, Appellee.

(*July* 5, 1951.)

TUNNELL, Justice, and TERRY and CAREY, J. J., sitting.

*Arthur G. Logan* and *Samuel R. Russell* (of Logan, Marvel and Boggs) for Appellant.

*William S. Potter* and *James L. Latchum* (of Berl, Potter and Anderson) for Appellee.

Supreme Court, No. 2, November Session, 1950.

TUNNELL, J., delivering the opinion of the Court:

On the 11th day of August, 1925, Argo Oil Company, a corporation of the State of Delaware, issued to A. A. Hall & Company certificate No. T02759 for ninety shares of its capital stock. On the 3rd day of January, 1927, A. A. Hall & Company assigned the said certificate in blank, the signature being duly guaranteed. What happened to the certificate after January 3rd, 1927, and prior to May 3rd, 1929, is not completely reported in the record. On the 3rdday óf May, 1929, the said certificate was sold by a New York broker, whose identity is not here material, to the plaintiff-below, appellant, hereinafter referred to as the "plaintiff". From May 3rd, 1929, until April 22nd, 1948, the plaintiff made no application to have the shares transferred to his own name, leaving them registered on the books of the company all the while, so far as he knew, in the name of A. A. Hall & Company. Although dividends were paid on these shares at least once each year from 1934 to 1948, inclusive, the plaintiff never received any such dividend. The defendant, in fact, never knew the plaintiff as a stockholder or a person claiming ownership of stock until it received a letter from plaintiff, dated April 22nd, 1948, asking for transfer of the shares to plaintiff's name.

On the 9th day of November, 1936, Argo Oil Company, together with another corporation in which we have no interest, merged, the surviving corporation being Argo Oil Corporation, the defendant-below, appellee, hereinafter referred to as "defendant". A. A. Hall & Company, being a stockholder of record, received notice of the merger proceedings, but could not locate its certificate No. T02759. On the 30th day of December, 1936, A. A. Hall & Company, upon affidavit that the certificate could not be surrendered because it was lost or destroyed, and upon execution of a bond with surety, made payable to Argo Oil "Company", obtained a substitute certificate for ninety shares, being certificate No. 571.

The above-mentioned bond was executed December 30, 1936 but, nevertheless, contained a recital indicating that Argo Oil "Company" had "agreed to issue" a new certificate. This bond was executed by A. A. Hall & Company and by a surety. There is in the record affirmative evidence indicating that certificate No. 571 was issued directly from the defendant corporation to A. A. Hall & Company, and indicating that no Argo Oil "Company" certificate was in fact issued to replace certificate No. T02759.

Certificate No. T02759 may have been lost or stolen, but it had not been destroyed, because from May 3rd, 1929, it had been, and still is, so far as this record indicates, in the possession of the plaintiff. Certificate No. 571 was in due course traded by A. A. Hall & Company until the shares it represented came into the ownership of one Anne B. Hall. The date of issuance of certificate No. 571 is not in the record, but it had to be by or before the 21st day of January, 1937, for on that date, upon a transfer of the shares, certificate No. 571 was surrendered and a new certificate issued.

When the plaintiff, in 1948, tried to obtain a certificate in his own name, the defendant refused to make the transfer and by letter to plaintiff recounted the facts substantially as above outlined. There being no possibility of obtaining the ninety shares from Anne B. Hall, who had acquired her stock in a legal manner, and the corporation refusing either to pay damages for the conversion or to furnish equivalent stock, this action of trover was brought for conversion of the plaintiff's shares.

The merger agreement contained the following language pertaining to exchange of stock certificates: "On and after November 5, 1936, certificates representing said shares of stock in Argo Oil Corporation shall be delivered to each shareholder in Argo Oil Company by the Secretary of Argo Oil Corporation upon the surrender to said Secretary at the office of the company, 1104 First National Bank Building, Denver, Colorado, of certificates representing an equal number of shares in Argo Oil Company."

Further, stock certificate No. T02759 contained on it, among other language, the following descriptive clause relating to the entire issue of capital stock of the said company: " * * * transferable on the books of the Company in person or by attorney upon surrender of this certificate properly endorsed."

In the court below three defenses were pleaded, but we are concerned only with the one interposing the Statute of Limitations, *Rev. Code* 1935, § 5129, as amended, 46 *Del. Laws, c.* 115. On that defense defendant moved for summary judgment on the pleadings, admissions, and a deposition, and in due course the trial court granted the motion. In respect to the summary judgment so granted, plaintiff has sued out this writ of error.

The plaintiff's first argument is that the issuance of stock certificate No. 571 was not a conversion of the ninety shares represented by stock certificate T02759. The reasoning by which this conclusion is reached depends upon acceptance of several successive propositions. To begin with, plaintiff asserts that Argo Oil Company first issued to Hall what plaintiff calls a "replacement" certificate, which Hall, in turn, presented to the corporation, in exchange for which the corporation issued stock certificate No. 571. Further, plaintiff asserts that a defunct corporation such as Argo Oil Company had no power to do anything at all, and, therefore, the replacement certificate which he says was issued was without legal effect. Next, plaintiff says that the defendant corporation could not issue a stock certificate in exchange for any other certificate unless a valid certificate for the shares in question was first physically surrendered. This last point in the series is, in turn, based upon a double foundation: the above-quoted language of the merger agreement as to surrender of stock and the similar language appearing on stock certificate No. T02759. In summary, plaintiff says that since no valid certificate was surrendered because the valid one was elsewhere, that is, in the plaintiff's possession, and no other valid one could have been issued by Argo Oil Company after its existence had been terminated, therefore, the transaction that took place was no conversion at all, but only a

voluntary gift of ninety shares of stock to A. A. Hall & Company.

The trial court overruled this argument. It found as facts that Argo Oil Company issued a replacement certificate and that defendant corporation issued stock certificate No. 571 in exchange therefor. The trial court, however, considered that no legal defect underlay such a transaction. It held that while a defunct corporation could not carry on the business purposes for which is was created, nevertheless, termination of corporate existence did not deprive the general public of the power to trade in the property represented by the remains of the corporate structure, and that the statutory provisions contained in Section "60", *Rev. Code* 1935, § 2092, of the Delaware Corporation Law did not go so far as to prevent a corporation from complying with the demands of stockholders and issuing certificates from time to time to reflect the current status of ownership of shares therein.

Upon this record we cannot find with the trial court that Argo Oil Company in fact issued any stock certificate or any replacement certificate. That it may at one time have planned to do so, to be sure, is suggested by a recital in a bond to which this defendant was not a party. On the other hand, there is direct evidence that Argo Oil Company did not in fact issue the certificate.

Nevertheless, we have concluded that no finding of fact on this point is required, for we are unable to accept plaintiff's indispensable premise that defendant could issue no valid certificate without surrender of a valid certificate. We are of the opinion that if a corporation is indifferent to the consequences, it can convert a stockholder's shares without bond, affidavit, surrender of certificate or anything else. We believe that this portion of the case is controlled by the provisions of Section 70 and 71 of the Delaware Corporation Law, appearing in *Revised Code of Delaware*, 1935, as paragraphs 2102 and 2103 respectively. These two sections of our *Code* provide in detail the procedural steps to be taken by stockholders in a Delaware cor-

poration who may have been unfortunate enough to have certificates of stock lost or destroyed. They provide first for application to management for the issuance of replacement certificates, and failing favorable action by management, for resort to the courts on petition for a rule to show cause why new certificates should not be issued. Upon a proper showing, it is mandatory for a Delaware corporation to issue a certificate of stock in such circumstances. The only discretion afforded by the statute concerns the terms of issuance. Management may or may not require the posting of a bond adequate for its protection, although the courts lack the power to dispense with that requirement against the corporation's will. The interpretation which plaintiff puts upon the language in the merger agreement and that on the stock certificate would be quite irreconcilable with the statute. Surely a stock certificate cannot be surrendered if it is "lost or destroyed". There might be serious question as to whether any provisions in the merger agreement or on the stock certificate contrary to the provisions of Sections 70 and 71 of the Delaware Corporation Law would be valid. However, we find no such contrary connotation. To us, it appears that the language in the merger agreement and on the stock certificate contemplates the statute and is entirely consistent with it. The language simply assumes the usual facts of existence and accessibility of all certificates. It does not refer to the occasional instances of loss or destruction of certificates. That relatively unusual situation is covered by the statute and implied in the language of the merger agreement and the stock certificate.

■ We are not concerned by any problem which presumably could arise if a trial were allowed and if it should be developed at the trial that the facts accord with the assumed circumstances most favorable to plaintiff, namely, that Argo Oil "Company" did issue a certificate and that the defendant corporation never received any bond, affidavit, or any formal writing of demand. Our reasoning is clearly not to be affected by the presence or absence of any certificate issued by Argo Oil "Com-

pany". It is sufficient for us that defendant issued a new certificate in lieu of the old one. Plaintiff could have relied upon his certificate and sued for compulsory transfer of his shares, or he could have regarded the act as conversion and sued for the tort. His property was given away to someone else who had no right to receive it. Requiring an affidavit, as we have already pointed out, was a discretionary matter with the management. Likewise, it is discretionary and quite immaterial whether any bond was required or not. The only importance of a bond would be to determine whether the surety company or the defendant would have the financial burden to bear if timely suit were brought for the tort.

Having decided that a conversion took place when stock certificate No. 571 was issued, we are next confronted by the contention that the Statute of Limitations, which under our law begins to run when the cause of action "accrues", does not begin to run in a situation of this kind until the person whose property has been converted has knowledge of the commission of the tort. Some principles of fairness appear at first view to commend that argument, but precedent saves us from a serious problem. It is well established in common law jurisdictions generally that ignorance of the facts is in the ordinary case no obstacle to the operation of a Statute of Limitations. There are, of course, certain well defined exceptions, such as infancy, incapacity, certain types of fraud, or concealment of the facts which would have disclosed the tort; but plaintiff has not pointed to any authority, and we have found none, indicating that this case falls within any of the known exceptions to the rule. We again approve the Vice-Chancellor's view of the law on this point as expressed in *Wise v. Delaware Steeplechase & Race Ass'n*, (*Del. Ch.*) 39 *A.* 2d 212; affirmed (*Del. Ch.*) 45 *A.* 2d 547, 165 *A. L. R.* 830. There is no suggestion of concealment or fraud in this case. Plaintiff's long-maintained ignorance of what happened to his stock, therefore, gives him no aid.

In deciding, as we have done, that ignorance of a conversion

110

does not impede the operation of the Statute of Limitations, we acknowledge that other courts have indicated a contrary opinion. *Holly Sugar Corporation v. Wilson,* 101 *Colo.* 511, 75 *P.* 2d 149. *Sharon v. Kansas City Granite & Monument Co.,* 233 *Mo. App.* 547, 125 *S. W.* 2d 959; *Cleveland Mahoney Railroad Co. v. Robbins,* 35 *Ohio St.* 483. Nevertheless, we find the Delaware rule to be as we have here described it, and we believe ours to be the rule in the majority of common law jurisdictions. 37 *Corpus Juris* 969, 54 *C. J. S., Limitation of Actions* § 205.

█ Plaintiff has also earnestly pressed the argument that the tort of conversion is actually not committed until there has been a demand for the delivery of the property and a refusal to surrender it. In some instances, as for example, when a man lends a chattel to another, it would be wholly unconscionable to permit the bailor to sue and recover judgment and costs of conversion against the bailee until the court could be convinced that there had been an actual effort to withhold the property. Therefore, in such a case, in the absence of a demand and refusal, the court could not give the plaintiff judgment in trover. On the other hand, if a person should consume, sell, destroy, or otherwise dispose of the article loaned, there would be no purpose in demanding its return. The law generally never requires that a person go through the motions of doing what would be futile or demanding that another do what he has put it out of his power to perform. To us the purpose of the "demand and refusal" rule, in those cases where it applies, is simply to settle whether there has been a conversion or not. If from other circumstances it is clear that the tort has been committed, the question needs no such further settlement, and the court moves on to whatever other questions are in the case, usually the assessment of damages. This court established precedent for our view in *Drug, Inc. v. Hunt,* 5 *W. W. Harr.* 339, 169 *A.* 87, but we especially admire Judge Woolley's statement of the rule as it appears in his *Delaware Practice, Vol.* 2, Section 1520.

In our opinion there is no requirement in a case such as the

one before us that there first be a demand and refusal to transfer. The conversion was committed when stock certificate T02759 was cancelled on defendant's books and the new certificate No. 571 issued for the same stock. The conversion occurred on or before the 21st day of January, 1937, and the operation of the three-year Statute of Limitations began immediately. Plaintiff's right of action in this case expired at the latest by the 20th day of January, 1940. This suit was not instituted until the 5th day of May, 1949.

A decree will be entered affirming the judgment of the Superior Court.