**CAVALIER GROUP, a Delaware general partnership, Plaintiff,**

v.

**STRESCON INDUSTRIES, INC., a Maryland corporation, The Travelers Indemnity Company of America, a Georgia corporation, Defendant and Third–Party Plaintiff,**

**Louis Capano & Sons, Inc., a Delaware corporation, Third–Party Defendant.**

**Civ. A. No. 88–620 MMS.**

United States District Court,
D. Delaware.

Jan. 22, 1992.

George H. Seitz, of Prickett, Jones Elliott, Kristol & Schnee, Wilmington, Del., for Cavalier Group and Louis Capano & Sons, Inc.

R. Stokes Nolte of Bailey & Wetzel, P.A. and James S. Green of Duane, Morris & Heckscher, Wilmington, Del., for Strescon Industries, Inc.

Warren B. Burt of Burt & Burt, Wilmington, Del., for Travelers Indem. Co. of America.

## OPINION

MURRAY M. SCHWARTZ, Senior District Judge.

Plaintiff, the Cavalier Group, ("Cavalier") owner of the Cavalier Country Club Apartments in Newark, Delaware, filed this diversity action on November 3, 1988 seeking to recover the cost of repairing and replacing concrete balconies at the apartment complex. The balconies were designed, fabricated and installed by the defendant Strescon Industries, Inc. ("Strescon"). (Compl., ¶ 3 (Dkt. 1)). Cavalier contends that the balconies failed due to the negligence in Strescon's design and/or manufacturing process which was exacerbated by what is known in the construction industry as the freeze/thaw effect.

In March 1989, Strescon answered denying negligence and contending that the loss resulted from failure to construct the balconies in accordance with construction plans or improper maintenance of the system by Cavalier. (Answer, ¶ 7 (Dkt. 5)). It also asserted that the claim was barred by the applicable statute of limitations. (Answer, ¶ 10 (Dkt. 5)). At the same time Strescon brought in as a third-party defendant Louis Capano & Sons, Inc., the general contractor, who Strescon contended was responsible for the failure to construct the balconies according to the project plans. On September 6, 1989, Cavalier amended its Complaint to add an additional party defendant, The Travelers Insurance Company ("Travelers"). (Dkt. 8A). Cavalier contends that Travelers, under its all-risk policy, had a duty to reimburse it for damages incurred as a result of the failure of its balcony system.

Strescon and Travelers have filed separate motions for summary judgment. The basis of Strescon's motion is that Cavalier's action is barred by the statute of limitations. In response plaintiff urges its action is saved by the "time of discovery rule." Travelers' predicate for summary judgment is that there is no coverage because its insurance policy excludes losses for damages caused by deterioration. In response, plaintiff urges that the exclusion for deterioration in the insurance policy is ambiguous and, in any event, the loss complained of is a loss caused by negligent design and manufacture, not deterioration; therefore, there is coverage under the insurance policy.

The respective summary judgment motions of Strescon and Travelers will be denied for the reasons set forth below.

## I. FACTUAL BACKGROUND

The Cavalier Apartments is a residential complex in Newark, Delaware comprised of 32 three story apartment buildings which were built between 1973 and 1978. (Pl.'s Second Am.Compl., ¶ 6, (Dkt. 10); Third-Party Compl., ¶ 22, App. to Pl.'s Answering Br. to Strescon at A-6 (Dkt. 58); Eringis Dep., App. to Pl.'s Answering Br. to Strescon at A-83 (Dkt. 58)). During the planning and construction of the apartments, then owner, Louis J. Capano, through his architect and other agents, contracted with Strescon Industries for the purposes of using its product, a precast slab of hollow core concrete planks, as a combination floor/balcony for the apartments. The work was accomplished in stages and the last active participation by Strescon in the project was in 1978. (Pl.'s Second Am. Compl., ¶ 6 (Dkt. 10)).

Generally, the Strescon planks used at the Cavalier Apartments serve an interior application and are not exposed to exterior elements. Some planks, however, are exposed serving as balconies for second and third floor apartments. In three of the buildings Strescon planks are "slung" parallel to the exterior walls and rest upon two

masonry bearing walls which are perpendicular to the apartments. (Nowland Dep., App. to Pl.'s Answering Br. to Strescon at A–95–96 (Dkt. 58); Paul Report, App. to Cavalier's Answering Br. to Strescon at A–18 (Dkt. 58)). These balconies are referred to as "slung" balconies. The majority of the buildings, however, have balconies which consist of Strescon planks cantilevered out approximately five feet beyond the outside wall. (App. to Pl.'s Answering Br. to Strescon at A–2 (Dkt. 58); Paul Report, App. to Pl.'s Answering Br. at A–18–19 (Dkt. 58)). These are referred to as "cantilevered" balconies.

In 1982, Joseph Capano ("J. Capano"), a partner of the Cavalier Group, noticed that some slung balconies in two of the buildings had severely deteriorated. Specifically, he noticed that the bottom sides were beginning to crumble and fall off. (J. Capano Dep., App. to Cavalier's Answering Br. to Strescon at A–47–49 (Dkt. 58); Kohler Mem., *Id.* at A–59)). J. Capano then notified Strescon. Strescon conducted an on-site inspection and recommended replacement of the damaged planks, which was done by Strescon. At the same time Mr. Capano inspected the cantilevered balconies but did not observe any problems. *Id.*

In 1986 additional slung balconies in the same buildings severely deteriorated. (J. Capano Dep., App. to Pl.'s Answering Br. to Strescon at A–51 (Dkt. 58)). Capano notified Strescon who sent Eric Denny, from its Engineering Department, to do an on-site inspection. (Denny Dep., App. to Pl.'s Answering Br. to Strescon at A–61–62, 68 (Dkt. 58)). Denny recommended replacement of the failed slung balconies, which again was done by Strescon. (J. Capano Dep., App. to Pl.'s Answering Br. to Strescon at A–52 (Dkt. 58); Capano Ex. 1, App. to Pl.'s Answering Br. to Strescon at A–58 (Dkt. 58); Denny Dep., App. to Pl.'s Answering Br. to Strescon at A–68 (Dkt. 58)).

As part of this 1986 inspection, Denny also examined the cantilevered balcony system. He noticed some staining of the undersides of the balcony and minor freeze/thaw damage which could spread if not attended to and which he thought could result in structural problems at some later time. (Denny Dep., App. to Pl.'s Answering Br. to Strescon at A–73–74 (Dkt. 58)).

The parties disagree as to when Cavalier first noticed that the cantilevered balconies were deteriorating. Christopher Nowland, the proper manager for Capano properties, and Louis Capano testified through deposition that they first noticed signs of deterioration in 1987 when they inspected the balconies. (L. Capano Dep., App. to Pl.'s Answering Br. to Strescon at A–60 (Dkt. 58); Nowland Dep., App. to Pl.'s Answering Br. to Strescon at A–97–99 (Dkt. 58)). Defendant, on the other hand, points to the testimony of plaintiff's expert, Michael Paul, P.E., who testified that signs of deterioration would have been evident two to three years earlier than his first visit to the apartments in the summer of 1987. (Paul Dep., App. to Strescon's Reply Br. at C–1–2 (Dkt. 61)).

Paul conducted a study and issued a report dated May 6, 1988. Paul found the deterioration resulted from two moisture related mechanisms. One related to improper "air content" in the cantilevered balconies, making it subject to rapid freeze/thaw damage. (Paul Report, App. to Pl.'s Answering Br. to Strescon at A–22 (Dkt. 58); Wills Dep., App. to Pl.'s Answering Br. to Strescon at A–114–15 (Dkt. 58)). The other related to the placement of metal reinforcement bars in the planks too close to the surface leading to corrosion of the metal which expanded and caused cracking and spalling. (Paul Report, App. to Pl.'s Answering Br. to Strescon at A–22 (Dkt. 58)). Both these conditions allowed moisture to permeate the concrete, causing increased damage due to the freeze/thaw action ultimately leading to the premature failure of the balconies. (Paul Dep., App. to Pl.'s Answering Br. to Strescon at A–105–111 (Dkt. 58); Paul Report, App. to Pl.'s Answering Br. to Strescon at A–22 (Dkt. 58)).

The balconies were insured under an "all-

risk" policy with Travelers.[1] The policy contains a specific exclusion for losses caused by deterioration. That exclusion reads:

This form does not insure against loss

...

(6) by deterioration, inherent vice, latent defect, wear and tear; rust or corrosion; mold, mildew, wet or dry rot; contamination; insects or vermin; smog; smoke vapor or gas from agricultural or industrial operations....

(App. to Travelers' Opening Br. at A–2 (Dkt. 56)). Through deposition Stanley Eringis testified that cantilevered balconies' deterioration was not due to normal wear and tear. (Eringis Dep., App. to Travelers' Br. at A–9 (Dkt. 56)).[2]

## II. SUMMARY JUDGMENT MOTION

### A. *Summary Judgment Standard*

Summary judgment shall be rendered "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c).

[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

*Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The standard is not whether there is literally no evidence for the plaintiff, nor is it enough for the plaintiff to provide a scintilla of evidence supporting its position. *Anderson v. Liberty Lobby, Inc.,* 477 U.S.

242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). Where the appropriate level of showing is not made, "[t]he moving party is 'entitled to a judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2552–53. "*Celotex* made clear that Rule 56 does not require the moving party to *negate* the elements of the nonmoving party's case." *Lujan v. National Wildlife Federation,* — U.S. ——, 110 S.Ct. 3177, 3187, 111 L.Ed.2d 695 (1990).

A Court should grant a summary judgment motion when the record taken as a whole could not lead a rational trier of fact to find for the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. From recent Supreme Court cases "it is clear enough ... that at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249, 106 S.Ct. at 2511.

### B. *Defendant Strescon's Motion For Summary Judgment*

Defendant, Strescon, argues that the present action is barred by the statute of limitations set forth in title 10, section 8106 of the Delaware Code Annotated which states in pertinent part:

no action to recover damages caused by an injury unaccompanied with force or resulting indirectly from the act of de-

---

**1.** Counsel for Defendant Travelers characterized its policy with Cavalier as an all risk policy subject to exclusions.

**2.** When first submitted to the Court, page A–9 of Travelers' Appendix contained an omission. Counsel for Travelers corrected the mistake at oral argument. As corrected, page A–9 of Travelers' Appendix reads as follows:

Q. Would you characterize that *deterioration* as normal wear and tear?
A. No.
Q. Do you believe that the *deterioration* or condition you observed was a result of a freeze thaw action?

fendant shall be brought after the expiration of 3 years from the accruing of the cause of such action; subject, however to the provisions of §§ 8108–8110, 8119 and 8127 of this title.

Del.Code Ann. tit. 10, § 8106 (1975).[3] Plaintiff, however, argues its suit is not time barred because the statute of limitations period is tolled under the "time of discovery rule." [4]

■ In general, the statute of limitations begins to run from the date of the injury caused by the defendant, rather than from the date on which plaintiff became aware of the injury. *See Lembert v. Gilmore,* 312 A.2d 335, 337 (Del.Super.Ct.1973); *Mastellone v. Argo Oil Corp.,* 46 Del. 102, 82 A.2d 379, 383 (1951); *Began v. Dixon,* 547 A.2d 620, 623 (Del.Super.Ct.1988); *Studiengesellschaft Kohle, MBH v. Hercules, Inc.,* 748 F.Supp. 247, 252 (D.Del.1990). However, "[i]n recent years, this absolute standard has been eroded by holdings that particular types of negligent conduct which were inherently unknowable warranted postponement of the commencement of the limitation period until the victim discovered or should have discovered the wrong." *Consol. Am. Ins. Co. v. Chiriboga,* 514 A.2d 1136, 1138 (Del.Super.Ct.1986). This exception to the general rule is known as the "time of discovery rule." That exception provides, "when an inherently unknowable injury ... has been suffered by one blamelessly ignorant of the act or omission and injury complained of, and the harmful effect thereof develops gradually over a period of time, the injury is 'sustained' ... when the harmful effect first manifests itself and becomes physically ascertainable." *Layton v. Allen,* 246 A.2d 794, 798 (Del.1968). When elaborating on the "time of discovery rule" the Delaware Supreme Court has noted,

'Even in malpractice and fraud cases where a discovery rule is applied it is not the actual discovery of the reason for the injury which is the criteria.... [D]is-

covery means discovery of facts constituting the basis of the cause of action *or* the existence of facts sufficient to put a person of ordinary intelligence and prudence on inquiry which, if pursued, would lead to the discovery.'

*Becker v. Hamada, Inc.,* 455 A.2d 353, 356 (Del.1982) (quoting *Omaha Paper Stock Co., Inc. v. Martin K. Eby Constr. Co.,* 193 Neb. 848, 230 N.W.2d 87, 89–90 (1975)).

■ With these general principles in mind, the Court turns to the facts of this case. Without the availability of the "time of discovery rule" plaintiff's action would be barred since Strescon completed its performance on or before 1978 (Pl.'s Second Am. Compl., ¶ 6 (Dkt. 10)) and the earliest complaint was filed in 1988, well after the three-year statute of limitations passed. Whether the statute of limitations acts as a bar turns on (1) whether the "inherently unknowable" doctrine applies in this case and, if it does apply, (2) whether plaintiff knew or should have known of the elements of the cause of action three years before the complaint was filed.

Strescon urges that the "time of discovery rule" should not be extended to cover the facts of this case since the doctrine remains the exception to the general rule. While the general rule—that the statute of limitations begins to run from the date of the injury caused by the defendant—remains, Delaware courts have been willing to carve out increasingly more exceptions to that rule. The time of discovery rule was first applied by the Delaware Supreme Court in a medical malpractice case. *See Layton v. Allen,* 246 A.2d 794 (Del.1968). The discovery rule was subsequently applied to a claim of malpractice by an accountant in *Isaacson, Stolper & Co. v. Artisan's Sav. Bank,* 330 A.2d 130 (Del.1974). Five years later the rule was applied to an attorney malpractice claim. *See Pioneer Nat. Title Ins. Co. v. Child, Inc.,* 401 A.2d 68 (Del.1979). Five years after *Isaacson* the rule was again

---

3. At oral argument, Defendant Strescon abandoned its argument that Plaintiff's action was also barred by title 10, section 8127 of Delaware Code Annotated.

4. This rule is sometimes referred to as the "inherently unknowable injury doctrine."

extended to a claim against the manufacturer of products containing asbestos. *See Bendix Corp. v. Stagg,* 486 A.2d 1150 (Del. 1984). Lower state courts have also extended the discovery rule. For instance, *Chiriboga,* 514 A.2d 1136, extended the rule to negligent design and/or construction resulting in damage to a summer resort condominium; and *Hodges v. Smith,* 517 A.2d 299 (Del.Super.Ct.1986), extended the rule to cover survey errors.

Defendant Strescon urged at oral argument that the discovery rule should be limited to those situations in which the plaintiff relies on the expertise of the defendant in rendering the professional service. The Delaware Supreme Court, however, has already rejected this position: "Although we have thus far applied the *Layton* discovery rule in those cases where the expertise of the defendant in rendering professional service is relied upon, the holding of Layton [sic] is not limited to those types of cases." *Bendix,* 486 A.2d at 1152.

In *Rudginski v. Pullella,* 378 A.2d 646 (Del.Super.Ct.1977), Judge (now Chief Justice) Christie stated:

I can find no reasonable distinction between the cases involving hidden malpractice of doctors, accountants and lawyers and the hidden errors of a plumber. Certainly, a negligently installed underground septic system which had not yet malfunctioned was no more likely to be found than a hidden act of malpractice.

*Id.* at 649.

Taking the facts most favorable to the plaintiff, the balconies' deterioration was caused, at least in part, by the air content of the concrete and the placement of the reinforcing metal. Neither the placement of the metal rods within the concrete planks nor the air entrainment are visible characteristics of the concrete. The type of design defects at issue in this case are, therefore, no more likely to be discovered than an act of malpractice. Indeed, the

manufacturing defect could not have become known to the plaintiff until the balcony began to show outwardly visible signs of abnormal deterioration. Just as then Judge Christie saw no logical basis to decline the discovery rule in a case involving a negligently installed septic tank, the Court now sees no logical basis to decline to apply the rule in this case. Moreover, this conclusion is consistent with the Delaware Supreme Court history of expanding the time of discovery rule.

"In cases where the statute of limitations is tolled because an action is inherently unknowable the party seeking the relief must show they were blamelessly ignorant of the act or omission and the injury." *Studiengesellschaft,* 748 F.Supp. at 252 (citing *Wilson v. Simon,* 1990 WL 63922 (Del.Super.Ct.1990); *Began,* 547 A.2d at 623). At oral argument counsel for Strescon agreed that air entrainment and the location of the metal rods within the plank were not readily discoverable. Therefore, plaintiff would have been blamelessly ignorant of the act or omission until something put it on notice of a problem.

■ Defendant argues there are three facts suggesting plaintiff is not "blamelessly ignorant." First, defendant argues that the problems with the slung balconies in 1982 should have put plaintiff on notice that there was a problem with the cantilevered balconies since the two types of balconies are essentially identical in design. Second, defendant argues that a representative of the defendant recommended preventive maintenance on *all* balconies in 1982; [5] preventive maintenance for "maintenance free" balconies should have put plaintiff on notice of a problem. Third, defendant emphasizes the deposition of plaintiff's expert, Mr. Paul, who testified that signs of deterioration would have first appeared by 1984 or at least by August 1985.[6] Because this action was filed more

---

5. In his May 24, 1982 memorandum, Dennis Kohler, a representative of Strescon, stated, "From what I could see most of the cantilevered spand deck plank in the complex were in fair condition, but in need of preventative maintenance." (A–1 of Strescon's appendix).

6. Paul first inspected the Cavalier Apartments in the summer of 1987. When asked if he had an opinion as to when the deterioration would have first become obvious to a layman he responded: "Two to three years." (App. to Traveler's Br. at A–20). Two to three years prior to

than three years subsequent to August 1985, defendant argues that the suit is barred by the statute of limitations.

While there are substantial similarities between the slung balconies and the cantilevered balconies,[7] the fact remains that in 1982 the slung balconies, not the cantilevered balconies, fell apart. Indeed after the slung balconies were replaced in 1982, Joseph Capano examined the cantilevered balconies and noticed no problems. (App. to Cavalier Group's Answering Br. in Opposition to Strescon's Motion for Summary Judgment at A–49–51, A–59). Therefore, the fact that the slung balconies fell apart in 1982 is not necessarily dispositive of whether plaintiff had notice that the cantilevered balconies would also have problems in the future.

Defendant's second argument, that a defendant's representative recommended preventive maintenance on *all* balconies in 1982, might have put the plaintiff on notice that there was a problem if there was evidence in the record that the cantilevered balconies were maintenance free. At oral argument, however, counsel for defendant conceded that nothing in the record before the Court indicates that the balconies were indeed maintenance free.

To counter defendant's third argument regarding Mr. Paul's testimony, plaintiff offers the deposition testimonies of Louis Capano and Christopher Nowland. Louis Capano stated that there was no abnormal visible deterioration until 1987. Christopher Nowland, the property manager for Capano Properties, also testified that there was no deterioration prior to the spring of 1987. If Mr. Capano and Mr. Nowland are believed, then the cause of action is timely under the discovery rule.

Because there is a factual dispute about (1) whether the cantilevered and slung balconies are different and (2) when the abnormal deterioration manifested itself (Mr. Capano and Mr. Nowland state the first signs of deterioration appeared in 1987 while Mr. Paul states signs of deterioration would have been evident by 1985), summary judgment will be denied.

### C. *Defendant Travelers' Motion For Summary Judgment*

■ Defendant Travelers argues (1) deterioration occurred; (2) deterioration is specifically excluded from coverage under the all-risk policy; and (3) the term "deterioration" is unambiguous.[8] Plaintiff makes two alternative arguments in response. First, the term "deterioration" *is* ambiguous. Second, the ultimate loss was not caused by deterioration, but by design defects and the freeze/thaw cycle; deterioration was only an incidental effect. The Delaware Supreme Court has not specifically addressed either issue raised by plaintiff, and thus, this Court must predict how the Delaware Supreme Court would rule were it adjudicating the case.

When state courts are silent on a particular state law issue, federal courts have,

> responsibility for determining and applying state laws in all cases within their jurisdiction in which federal law does not govern. Accepting this responsibility ... [federal courts have] not hesitated to decide questions of state law when necessary for the disposition of a case brought to it for decision, although the highest court of the state had not answered them, the answers were difficult, and the character of the answers which the high-

the August 1987 visit by Paul are the summers of 1984 and 1985, which is more than three years prior to November 3, 1988 when plaintiff's suit was filed.

**7.** First, both were designed by Strescon. (¶ 6 of Pl. Second Am.Compl.). Second, both balconies were hollow core and span deck, pre-cast concrete slab balconies. (¶ 6 of Pl. Second Am. Compl.). Third, there is nothing in the record indicating that the alleged cause of deterioration of the cantilevered balconies was any different

than the alleged cause of the deterioration of the slung balconies.

**8.** For purposes of this motion defendant abandoned any argument that the policy excluded coverage for design defects or the freeze/thaw process. Instead, defendant relied solely on the exclusion for deterioration. For purposes of this motion, the Court therefore, assumes that losses from design defects and the freeze/thaw process are covered under the all-risk policy.

est state courts might ultimately give remain uncertain.

*Meredith v. Winter Haven,* 320 U.S. 228, 237, 64 S.Ct. 7, 12, 88 L.Ed. 9 (1943). When the highest state court has not dealt with a particular issue,

> it is the duty of the federal court to predict how the state's highest court would decide the question were it adjudicating the matter. In order to make an accurate prediction of this kind, a federal court should examine all relevant sources of the pertinent state law including related decisions of the highest state court, decisions of the intermediate appellate courts, decisions of lower courts, scholarly treatises, Restatements of Laws, and germane law review articles.

*Jones & Laughlin Steel Corp. v. Johns–Manville Sales Corp.,* 626 F.2d 280, 285 (3d Cir.1980) (footnote omitted); *see also* 19 Charles A. Wright et al., *Federal Practice and Procedure* § 4507 at 99–103 (1982). Also relevant is the majority rule established by other states. *Cf. Robertson v. Allied Signal, Inc.,* 914 F.2d 360, 380 (3d Cir.1990).

■ At oral argument, Travelers characterized its insurance policy with Cavalier as an "all-risk" policy subject to certain exclusions. An "all-risk" insurance policy extends coverage to risks not generally protected under other insurance policies. *C.H. Leavell & Co. v. Fireman's Fund Ins. Co.,* 372 F.2d 784, 787 (9th Cir.1967); 13A George J. Couch *Couch on Insurance* § 48:141 at 139 (M.S. Rhodes ed. 1982); Annotation, *All Risk Insurance—Design Flaws,* 41 A.L.R.4th at 1096 (1985). Recovery for losses under an all-risk policy is allowed for all fortuitous losses not resulting from the fraudulent act or misconduct of the insured. *Dow Chem. Co. v. Royal Indem. Co.,* 635 F.2d 379, 386 (5th Cir. 1981); 13A *Couch,* § 48:141 at 139; Annotation, *'All Risk' Insurance—Coverage,* 88 A.L.R.2d at 1125 (1963). "All-risk" policies may contain written and implied exclusions. *Standard Structural Steel Co. v. Bethlehem Steel Corp.,* 597 F.Supp. 164, 191 (D.Conn.1984). However, "all-risk" clauses

should be given a broad and comprehensive meaning to cover incurred losses. *Standard Structural Steel Co.,* 597 F.Supp. at 191. Losses which are not subject to coverage must be specifically excluded in a policy. *Dow Chemical,* 635 F.2d at 386; 13A *Couch,* § 48:143 at 143; 88 A.L.R.2d at 1125.

Travelers urges that its policy contains a passage specifically excluding coverage by pointing to the following exclusion:

> Losses ...
>
> (6) by deterioration, inherent vice, latent defect, wear and tear; rust or corrosion; mold, mildew, wet or dry rot; contamination; insects or vermin; smog; smoke, vapor or gas from agricultural or industrial operations; ....

(Travelers' App. at 1–2). Travelers has limited its argument on this motion solely to the exclusion for losses by deterioration [9] arguing that because the balconies unambiguously deteriorated, coverage should be excluded regardless of the cause of that deterioration.

■ When the language of an insurance contract is clear and unequivocal, the parties are bound by its plain meaning "because creating an ambiguity where none exists could, in effect, create a new contract with rights, liabilities and duties to which the parties had not assented." *Hallowell v. State Farm Mut. Auto. Ins. Co.,* 443 A.2d 925, 926 (Del.1982). Therefore, " 'if the language is clear and unambiguous a Delaware court will not destroy or twist the words under the guise of construing them.' " *Aetna Cas. & Sur. Co. v. Kenner,* 570 A.2d 1172, 1174 (Del.1990) (quoting *Hallowell,* 443 A.2d at 926). If the language is ambiguous, however, it will be construed strictly against the insurer to effectuate the reasonable expectations of the insured. *Hallowell,* 443 A.2d at 927. Given the procedural context, this Court's sole task is to determine whether an ambiguity exists. In so deciding, this Court recognizes that it can rule in Traveler's favor "only if the policy interpretation it

---

9. Indeed, Traveler's appendix is replete with references to "deterioration" of the balconies.

advances is clearly correct." *See Kenner,* 570 A.2d at 1174.

Whether a contract is ambiguous is a question of law. *See Tigg Corp. v. Dow Corning Corp.,* 822 F.2d 358, 362 (3d Cir. 1987) (interpreting Michigan law); *Hutchison v. Sunbeam Coal Corp.,* 513 Pa. 192, 519 A.2d 385, 390 (1986); *Garza v. Marine Transport Lines, Inc.,* 861 F.2d 23, 27 (2d Cir.1988); *cf. Kenner,* 570 A.2d at 1174; *see also* 10A Wright & A. Miller, *Federal Practice and Procedure* § 2730.1 at 279 (1983). "[A]n ambiguity exists when the language of a contract permits two or more reasonable interpretations." *Hallowell,* 443 A.2d at 926. "Ambiguity does not exist merely because two conflicting interpretations may be suggested. Rather, both interpretations must reflect a reasonable reading of the contractual language. Moreover, we must examine all relevant portions of the policy rather than reading a single passage in isolation." *Kenner,* 570 A.2d at 1174 (citation omitted).

In determining whether an ambiguity exists, terms in an insurance policy are accorded their ordinary and usual meaning. *See New Castle County v. Hartford Acc. & Indem. Co.,* 933 F.2d 1162, 1188–89 (3d Cir.1991); *see generally* Heckler & Goode, *Wear and Tear, Inherent Vice, Deterioration, Etc.: The Multi–Faceted All–Risk Exclusions,* XXI Tort & Ins. L.J. (Summer 1986) (A.B.A. publication) [hereinafter, "Heckler & Goode"]. Accordingly, opinions are often replete with dictionary definitions of exclusionary terms. Heckler & Goode at 638.

Turning to the ordinary and usual meaning of "deterioration" in this case, the Court initially notes case authority from other jurisdictions defining "deterioration" is sparse. *See* Heckler and Goode at 649. Counsel have cited no Delaware state cases defining "deterioration" nor has independent research by the Court revealed any such cases. At oral argument, both counsel had difficulty defining the ordinary and usual meaning of "deterioration." Counsel for Travelers eventually defined deterioration as the "gradual disintegration of a structure over time." Black's Law Dictio-

nary defines "deterioration," "with respect to a commodity, consists of a constitutional hurt or impairment, involving some degeneration in the substance of the thing, such as that arising from decay, corrosion, or disintegration." *Black's Law Dictionary* 450 (6th ed. 1990). The American College Dictionary defines "deterioration" as the noun form of "deteriorate." "Deteriorate" is defined: "to make or become worse; make or become lower in character or quality." *American College Dictionary* 330 (1970). Webster's Third International Dictionary defines "deterioration" as "the action or process of deteriorating or state of having deteriorated: gradual impairment." *Webster's Third International Dictionary* 616 (1971).

Black's definition includes examples of causes of deterioration connoting natural and normal phenomena like decay, corrosion or disintegration. By excluding from the list nonnatural causes such as design defects or the negligence of third persons, Black's definition suggests there is a distinction between natural and nonnatural causes of deterioration. Plaintiff in this case has alleged, and there is some evidence in the record, that the balconies worsened not from ordinary and natural causes but in a faster than anticipated time frame due to negligent acts within a third parties exclusive control. (Dkt. 58 at 107–111). The American College Dictionary's definition does little to advance the inquiry because its definition of "deterioration" is neither fixed in severity nor in time. It merely defines "deterioration" as some lessening in value. Taken to an extreme, a building that collapsed the day after it was built could be characterized as "deterioration" since the building "lessened in value." It is inconceivable, however, that the parties would have intended exclusion (6) to encompass this type of "deterioration." Webster's definition incorporates the notion of *gradual* impairment. In this case the balconies worsened in condition over time. While the condition could be considered gradual in the sense that it took years to develop, it was not gradual in the sense that plaintiffs allege it occurred

much faster than would normally be expected. (Dkt. 58 at 107).

Plaintiff asserts that since "deterioration" is not defined in the policy and no distinction is made between naturally and abnormally caused deterioration, it is reasonable to associate the term with natural events, not deterioration caused by abnormal events, such as design defects and a freeze/thaw cycle. Plaintiff's position is consistent not only with Black's and Webster's definitions, but also with the policy itself.[10] In the policy "deterioration" was listed in conjunction with "wear and tear," "latent defect," and "inherent vice." All these listed categories relate to normal and inevitable occurrences, not occurrences like negligence that are within someone else's control.

"It is a commonly known fact of language that words take on different meanings in different settings." *Barash v. Ins. Co. of North Am.*, 114 Misc.2d 325, 451 N.Y.S.2d 603, 606 (N.Y.Sup.Ct.1982). Given the context of the exclusion and the dictionary definitions, plaintiff's position reflects a reasonable reading of the contractual agreement. "Deterioration" in the case at bar affords at least two objectively reasonable interpretations, making its meaning ambiguous as matter of law. Because Travelers' meaning is not clearly correct, summary judgment will be denied.

■ Alternatively, plaintiff urges while the "all-risk" policy with Travelers excludes losses *by* deterioration, the loss allegedly suffered by Cavalier Group is not a loss by deterioration but by the negligence of Strescon and the freeze/thaw effect on the negligently made concrete planks. Since negligence and the freeze/thaw effect are not specifically excluded, they are covered under the all-risk policy.

Two leading treatises support plaintiff's position. According to Appleman, "where the insured risk was the last step in the chain of causation set in motion by an uninsured peril, or where the insured risk itself set into operation a chain of causation

in which the last step may have been an excepted risk," recovery may be allowed. 5 John Alan Appleman & Jean Appleman, *Insurance Law and Practice* § 3083 at 311 (1969). *Couch* is likewise in accord. *See* 18 *Couch* § 74:709–711, at 1018–22 (2d Rev. Ed.1983). Indeed, the Appleman rule appears to be the majority rule in those courts addressing the specific issue. *See Villella v. Pub. Employees Mut. Ins. Co.*, 106 Wash.2d 806, 725 P.2d 957, 962 (1986) (en banc) ("This established insurance law principle of proximate cause is the rule in a majority of jurisdictions."); *Standard Electric Supply Co., Inc. v. Norfolk & Dedham Mutual Fire Insurance Co.*, 1 Mass.App. 762, 307 N.E.2d 11, 13 (1973) ("well established principle"); *but see Kane v. Royal Ins. Co. of Am.*, 768 P.2d 678 (Col.1989) (en banc). Among those states adopting the Appleman rule is New Jersey. *See Ariston Airline & Catering Supply Co., Inc. v. Forbes*, 211 N.J.Super. 472, 511 A.2d 1278 (1986); *see also Franklin Packaging Co. v. California Union Ins. Co.*, 171 N.J.Super. 188, 408 A.2d 448 (1979), *cert. denied*, 84 N.J. 434, 420 A.2d 340 (1980). Although New Jersey law is not precedent for the state of Delaware, Delaware courts have in the past relied on New Jersey opinions to help establish insurance law in Delaware. *See Hallowell*, 443 A.2d at 926–27 (following New Jersey's lead in recognizing the reasonable expectations doctrine).

Moreover, while Delaware courts have never referenced the specific Appleman rule recited in this opinion, the Delaware Supreme Court has, in another context, referenced the specific Appleman section at issue in this case. *See Am. Ins. Co. v. Synvar Corp.*, 239 A.2d 624, 625 (Del.1968) (referencing Appleman § 3083 when describing "the ordinary fire insurance case."). Indeed, the Delaware Supreme Court consistently cites Appleman as authority for basic principles of insurance law. *See e.g. Home Ins. Co. v. Honaker*, 480 A.2d 652, 653–54 (Del.1984) (citing Ap-

---

**10.** In so concluding the Court has declined to adopt the approach taken by California State Court of Appeals in *Murray v. State Farm Fire*

*and Cas. Co.*, 219 Cal.App.3d 58, 268 Cal.Rptr. 33 (1990) and cited by defendant Travelers in its reply brief.

pleman for the general rule that money paid due to a mistake of law is not recoverable); *Allstate Ins. Co. v. Spinelli,* 443 A.2d 1286, 1290 (Del.1982) (adopting Appleman rule that actions based on uninsured motorist coverage claims are actions ex contractu and as such are controlled by the applicable contract statute of limitations); *Pioneer Nat. Title Ins. Co. v. Child, Inc.,* 401 A.2d 68, 69–70 (Del.1979) (citing Appleman as authority for applicable rules of construction).

The Appleman rule is consistent with the observation that insurance policies are contracts of adhesion often negotiated at arms length and involving inferior bargaining power. *See Hallowell,* 443 A.2d at 926. Travelers alone drafted the policy; had Travelers meant to exclude design defects or the freeze/thaw process from coverage it could have done so. *See Pan Am. World Air, Inc. v. Aetna Cas. & Sur. Co.,* 505 F.2d 989, 1003–4 (2d Cir.1974) ("The experienced all-risk insurers should have expected the exclusions drafted by them to be construed narrowly against them.").

Finally, there are public policy reasons for adopting plaintiff's position. Were the Court to construe the policy in the manner urged by defendant insurer,

> where an excepted peril operated to any extent in the chain of causation so that the resulting harm would not have occurred 'but for' the excepted peril's operation, the insurer would be exempt even though an insured peril was the proximate cause of the loss. Such a result would be directly contrary [to the general rule] for liability of the insurer where the peril insured against proximately results in the loss.

*Sabella v. Wisler,* 59 Cal.2d 21, 27 Cal. Rptr. 689, 696, 377 P.2d 889, 896 (1963) (citing 6 Couch, Insurance (1930), § 1464).

■ For the reasons set forth above, this Court predicts that the Delaware Supreme Court would adopt the Appleman rule urged by plaintiff. Accordingly, de-

fendant's summary judgment motion will be denied on this basis as well. Having denied defendant's summary judgment motion on two alternative bases, does not, however, mean that this Court would therefore grant summary judgment for plaintiff if plaintiff so moved. Under either the ambiguity analysis[11] or the Appleman analysis, it is highly likely there will be a factual dispute over whether design defects and the freeze/thaw processes were, in fact, the causes of the loss. Such a determination of fact is appropriately left to the finder of fact.

### III. CONCLUSION

For the reasons stated, summary judgment for both defendants Strescon and Travelers will be denied.

An appropriate Order will be entered.

---

**11.** Under the ambiguity analysis plaintiff is entitled to have the contract construed against the insurer to effectuate the reasonable expectations of the insured, *Hallowell,* 443 A.2d at 926, and

will recover if it is shown by a preponderance of the evidence that the "deterioration" in this case was deterioration from design defects and not deterioration from natural causes.