27 P.3d 645 (2001)
107 Wash.App. 468
KITTITAS RECLAMATION DISTRICT, a Washington Irrigation District, Respondent and Cross Appellant,
v.
SPIDER STAGING CORPORATION; and Flow International Corporation, Appellants.
No. 19535-0-III.
Court of Appeals of Washington, Division 3, Panel One.
July 26, 2001.
*646 Marc C. Levy, Preston, Thorgrimson, Seattle, for Appellants.
John P. Gilreath, Douglas W. Nicholson, Cone, Gilreath, Ellis & Cole, Ellensburg, for Respondent.
KATO, J.
Kittitas Reclamation District (Kittitas) contracted with Spider Staging Corporation (Spider) to design and build an incline inspection platform. During a demonstration, the platform did not function successfully. Kittitas demanded that Spider deliver a platform fit for its intended purposes or the platform would be rejected. Spider did not respond. Kittitas then sued Spider and its parent company, Flow International Corporation (Flow), for cancellation of contract and damages. The court found in favor of Kittitas and ordered Spider to pay $27,248.17, the cost of the platform. Claiming, among other things, that the statute of limitations precluded Kittitas's claim, Spider and Flow appeal. Kittitas cross-appeals the denial of prejudgment interest and consequential damages. Finding that the statute of limitations had run, we reverse.
Kittitas is an irrigation district organized pursuant to chapter 87.03 RCW. It was created in anticipation of the United States Bureau of Reclamation constructing the Kittitas division of the Yakima Irrigation Project.
Spider was an independent subsidiary of Flow. On September 30, 1997, Flow sold Spider's assets to Safeworks, a limited liability company. Spider's name was then changed to Flow Washington Corporation, which was later administratively dissolved in 1999.
Kittitas diverts water at Easton, Washington, through a main canal, which generally runs southwest of the Yakima River. Approximately 15 miles west of Ellensburg, the main canal connects with a siphon that passes underneath the Yakima River to divert water from the main canal to the north branch canal on the north side of the river.
The United States owns the siphon. Through the Bureau of Reclamation, it contracts with Kittitas to operate and maintain the facilities. Pursuant to this contract, Kittitas must periodically inspect the siphon.
Kittitas inspects the siphon by lowering an employee on a steel platform into the inclined portion of the siphon. In 1992, the Bureau of Reclamation advised Kittitas to replace the existing platform. Spider submitted a bid for the replacement platform, at a cost of $25,347.34 plus tax.
On October 19, Kittitas told Spider to begin constructing the platform. On November 29, Spider sent a purchase order to Kittitas outlining the cost of design and assembly. The total cost, including tax, was $27,248.17. *647 On January 10, 1994, Kittitas paid Spider in full.
In March 1994, Spider transported the platform to Kittitas. It was later returned at Spider's request for modifications. On April 6, 1995, Spider notified Kittitas that the platform was completed and ready for pick up.
A demonstration or field test of the platform was scheduled for November 1995, but it was canceled and rescheduled for April 1996. During the test, it became apparent that the platform would not function as intended. As it was lowered into the siphon, the back of the platform started to bend or deflect. Because the platform required extensive repairs, Kittitas asked Spider to modify the platform so that it would function as both a maintenance and inspection platform. Kittitas asked Spider for an estimate for these modifications.
Sometime after September 1997, Spider informed Kittitas the modifications would cost $120,000. Kittitas felt this was too expensive.
On October 26, 1998, Kittitas demanded that Spider deliver the platform fit for its intended purposes as originally designed after fully field testing it. Spider did not respond.
On September 8, 1999, Kittitas filed a complaint against Spider and Flow for cancellation of contract and damages. It alleged the implied warranty of fitness for the platform's intended purpose was breached.
The case proceeded to bench trial. Claiming the complaint was barred by the statute of limitations, Spider moved to dismiss. The court denied the motion. It determined Kittitas was entitled to judgment against both Spider and Flow for $27,248.17. This appeal follows.
Spider contends the court erred by failing to dismiss Kittitas's complaint as untimely. An action for breach of warranty must be brought within four years after the cause of action has accrued. RCW 62A.2-725(1).
A cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach. A breach of warranty occurs when tender of delivery is made, except that where a warranty explicitly extends to future performance of the goods and discovery of the breach must await the time of such performance the cause of action accrues when the breach is or should have been discovered.
RCW 62A.2-725(2). In other words, the statute of limitations period normally starts upon delivery of the goods. Holbrook, Inc. v. Link-Belt Constr. Equip. Co., 103 Wash.App. 279, 284, 12 P.3d 638 (2000). However, if goods are sold with a warranty of future performance, the statute of limitations starts from the date when the defect is or should have been discovered. Id. RCW 62A.2-725 provides a point of finality for businesses after which time they can destroy their business records without fear of a subsequent breach of warranty suit arising. Cent. Wash. Refrigeration, Inc. v. Barbee, 81 Wash.App. 212, 225, 913 P.2d 836 (1996), rev'd on other grounds, 133 Wash.2d 509, 946 P.2d 760 (1997).
At issue here is when Spider tendered delivery. Spider claims the platform was delivered in March 1994 or, at the very latest, in April 1995. In either instance, the September 1999 complaint would be untimely. But the trial court agreed with Kittitas that the platform was never delivered because a successful field test had not been performed.
"Tender of delivery" requires that the seller put and hold conforming goods at the buyer's disposition and give the buyer notification reasonably necessary to enable him to take delivery. RCW 62A.2-503(1). The official comments to the code shed some light on the meaning of the term:
The major general rules governing the manner of proper or due tender of delivery are gathered in this section. The term "tender" is used in this Article in two different senses. In one sense it refers to "due tender" which contemplates an offer coupled with a present ability to fulfill all the conditions resting on the tendering party and must be followed by actual performance if the other party shows himself ready to proceed. Unless the context unmistakably *648 indicates otherwise this is the meaning of "tender" in this Article and the occasional addition of the word "due" is only for clarity and emphasis. At other times it is used to refer to an offer of goods or documents under a contract as if in fulfillment of its conditions even though there is a defect when measured against the contract obligation. Used in either sense, however, "tender" connotes such performance by the tendering party as puts the other party in default if he fails to proceed in some manner.
RCW 62A.2-503, Uniform Commercial Code cmt. 1.
The official comment reveals both a narrow and broad definition of "tender of delivery." Wash. Freightliner, Inc. v. Shantytown Pier, Inc., 351 Md. 616, 625, 719 A.2d 541 (1998). The narrow definition is limited to the tender of conforming goods, while the broad definition includes the tender of nonconforming goods. Id. When interpreting "tender of delivery" for statute of limitations purposes, most courts have rejected the narrow definition because it creates a logical paradox; under the narrow interpretation, a seller who never ships conforming goods would never trigger the statute of limitations. Id. (citing Ontario Hydro v. Zallea Sys., Inc., 569 F.Supp. 1261 (D.Del.1983)).
The broad definition of tender anticipates a latent defect in the goods, though performance of the contract otherwise appears to be fulfilled. Baker v. DEC Int'l, 458 Mich. 247, 253, 580 N.W.2d 894 (1998). This definition of tender implies the seller has offered to deliver what he incorrectly believes to be conforming goods. Id. Defining tender in this manner is consistent with the policy of providing a finite period in time when the seller knows he is relieved from liability for possible breach of warranty. Id. Under this broad definition, tender of nonconforming goods will trigger the statute of limitations in warranty cases absent an explicit agreement to extend the warranty to future performance. Wash. Freightliner, 351 Md. at 627, 719 A.2d 541.
Washington has not yet had occasion to decide which definition of "tender of delivery" should apply. Now faced with this question, we adopt the broad definition because it is consistent with the policy behind the statute of limitations. Under this definition and the facts here, Spider tendered delivery and the cause of action accrued at the time it offered goods in accordance with its contract obligations. See Baker, 458 Mich. at 254, 580 N.W.2d 894. This date was April 1995, when Spider told Kittitas the platform was ready.
We must next determine if the field test of the platform had any bearing on whether there was a "tender of delivery." In Washington Freightliner, the Maryland court reviewed the rules of different jurisdictions with respect to testing and its effect on "tender of delivery" for the purpose of the statute of limitations. Wash. Freightliner, 351 Md. at 631-37, 719 A.2d 541. It noted that a New York court, using the narrow definition of "tender of delivery," did require that testing be complete before delivery was tendered. Id. at 632-33, 719 A.2d 541 (citing City of New York v. Pullman Inc., 662 F.2d 910 (2d Cir.1981)). The Maryland court distinguished the New York case and found that most jurisdictions held that, even if testing were a condition of the contract, the statute of limitations began with delivery and not on completion of testing. Wash. Freightliner, 351 Md. at 635-37, 719 A.2d 541.
Where the post-delivery testing is done by the seller, courts nevertheless have held that tender of delivery occurred when the goods were delivered. See H. Sand & Co. v. Airtemp Corp., 738 F.Supp. 760, 767 (noting, in particular, that the contract neither provided for a finite period of inspection nor delineated specific testing procedures); Long Island Lighting Co. v. Transamerica Delaval, Inc., 646 F.Supp. 1442, 1455 (holding that tender of delivery occurred when the engines were delivered, not when they were finally installed, even where the seller "had continuing responsibility for supervising the installation"); City of Cincinnati, Ohio v. Dorr-Oliver, Inc., 659 F.Supp. 259, 262 (holding that tender of delivery "is not contingent upon inspection, testing, or acceptance"). See also Ontario Hydro v. Zallea Sys., Inc., 569 F.Supp. 1261, 1268 (holding that the *649 testing requirements of the contract "in Pullman constituted a pre-delivery inspection, while the clause in question in this case more closely resembles a post-delivery inspection"). Cf. Baker v. DEC Int'l, 458 Mich. 247, 255 & n. 14, 580 N.W.2d 894, 898 & n. 14 (1998) (distinguishing H. Sand & Co., Dorr-Oliver, and Ontario Hydro on the ground that "contractual provisions for postdelivery testing or inspection do not toll the accrual of breach of warranty claims," as opposed to installation).
Wash. Freightliner, 351 Md. at 636-37, 719 A.2d 541. Connecticut has also held that the relevant statutory provisions in Article 2 of the Uniform Commercial Code do not, by themselves, make performance of the defendant's on-site testing obligations a condition of a tender of delivery. Flagg Energy Dev. Corp. v. General Motors Corp., 244 Conn. 126, 138, 709 A.2d 1075 (1998).
Most jurisdictions that have addressed this issue hold that testing does not bear any relationship to tender of delivery for statute of limitations purposes.[1] We find these cases persuasive. The testing here had no effect on the tender of delivery. The platform was delivered in April 1995 and the September 1999 complaint was thus time-barred.
Kittitas claims that, even if the agreement to perform field tests had no bearing on "tender of delivery," the tests at least invoked the tolling provision of the statute of limitations.[2] There is an exception to the four-year statute of limitations if "a warranty explicitly extends to future performance of the goods and discovery of the breach must await the time of such performance the cause of action accrues when the breach is or should have been discovered." RCW 62A.2-725(2). This exception is construed very narrowly. Cent. Wash., 81 Wash.App. at 224-25, 913 P.2d 836. In order for a warranty to be explicit, the warranty of future performance must be unambiguous, clearly stated, or distinctly set forth. Id. at 224, 913 P.2d 836. A warranty of future performance must also expressly refer to a future time. Id. at 225, 913 P.2d 836.
Kittitas has shown no evidence of an explicit warranty of future performance. Several documents refer to the testing and training, but none explicitly warrant the platform, or refer to a future time. Because there was no explicit warranty of future performance, the tolling provision of the statute of limitations is inapplicable.
Finally, Kittitas claims that the statute of limitations does not apply because the contract was a "sale on approval," and it therefore never accepted delivery. Kittitas did not raise this argument below and we will not consider it for the first time now. RAP 2.5(a).
Under the broad definition of tender of delivery, Spider tendered delivery of the platform in April 1995 when it informed Kittitas the platform was completed and ready to be picked up. The testing of the platform had no effect on that tender. Because RCW 62A.2-725(1) imposes a four-year statute of limitations that begins upon tender of delivery, Kittitas's September 1999 complaint was untimely.
We reverse the judgment in favor of Kittitas and order that the case be dismissed.
WE CONCUR: BROWN, A.C.J., and SWEENEY, J.
NOTES
[1] Kittitas spends much of its brief arguing that Washington Freightliner and its progeny support its assertion that testing can be a factor in determining if delivery was tendered. This is not so. Kittitas confuses testing with installation. Washington Freightliner does state that the clock for the statute of limitations does not begin to run until after the goods in question have been installed, when the contract expressly obligates the seller to install the goods. Wash. Freightliner, 351 Md. at 630, 719 A.2d 541. But it also holds further that testing has no effect on the tender of delivery.
[2] Kittitas also claims Spider's promise to repair tolled the statute of limitations. Although some jurisdictions have held that the statute of limitations is tolled by a promise to repair, others have rejected this rule as conflicting with the statute of limitations. Holbrook, 103 Wash.App. at 288, 12 P.3d 638. In Holbrook, Division Two rejected this doctrine. We agree with its reasoning and do so as well.