IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| TERRY SCHILLING and JULIE SCHILLING, husband and wife, and ARTISAN, INC., a Washington corporation, | ) ) ) ) ) | No. 34435-5-III |
| Appellants / Cross Respondents, | ) ) ) | |
| v. | ) ) | UNPUBLISHED OPINION |
| PROBUILD COMPANY, LLC, a Washington limited liability company, d/b/a Lumbermens, and MITEK INDUSTRIES, INC., a foreign corporation, | ) ) ) ) ) ) | |
| Respondents / Cross Appellants. | ) ) | |

No. 34435-5-III
*Schilling v. ProBuild Company, LLC*

PENNELL, A.C.J. — The parties cross appeal various orders on motions for

summary judgment. Of primary significance to this appeal is the trial court's ultimate

order dismissing all claims under the statute of limitations. Having conducted an

independent review of the record, we agree with the trial court's statute of limitations

analysis. The April 15, 2016, order of dismissal is therefore affirmed and all other

summary judgment orders are vacated as moot.

FACTS[1]

In September 2005, Terry and Julie Schilling contracted with Artisan, Inc., owned

by James Sevigny, to build a custom home in Union Gap, Washington. James Sevigny,

through Artisan, was the general contractor for the project. Altius Construction Services,

LLC, owned by James Sevigny's son, Josh (who was also an employee of Artisan), was

the building designer. Construction of the home began in late 2006.

The roof for the Schillings' home was to be constructed with custom trusses.[2]

---

[1] Because our review is limited to the defendants' motion for summary judgment regarding the statute of limitations, all facts are construed in the light most favorable to the plaintiffs. *See Jones v. Allstate Ins. Co.*, 146 Wn.2d 291, 300, 45 P.3d 1068 (2002).
[2] A truss is a single plane structural frame, formed by a series of triangles and used to support a building's roof. Trusses, commonly made of wood and connected with metal plates, are designed to support certain vertical weights or "loads." Clerk's Papers (CP) at 1522. The horizontal (or sloping) pieces that form the top and bottom of a truss are called chords. The sloping and vertical pieces of the truss that connect the chords are called the web.

2

Under the Union Gap Municipal Code, custom truss designs must be certified and stamped by a licensed Washington engineer.[3]  Artisan solicited a bid from and contracted with ProBuild Company, LLC, doing business as Lumbermen's, to manufacture the trusses for the Schillings' residence.

Artisan had a longtime working relationship with ProBuild's salesman, George Brooks.  Mr. Brooks was not an engineer, but he knew Artisan built high-end homes and that Artisan would expect the "'best of the best'" materials be used in its project.  Clerk's Papers (CP) at 1559.  Artisan submitted the Schillings' building design to Mr. Brooks so ProBuild could develop appropriate trusses.

The process used by ProBuild to manufacture trusses, such as the ones for the Schillings' residence, lies at the heart of this case.  ProBuild's trusses are built with design help from MiTek Industries.  MiTek operates in several states and sells metal plates and hardware to truss manufacturers such as ProBuild.  As part of the sale of its products, MiTek licenses computer software to its customers to use in developing truss designs.

---

[3] CP at 493, 2141-42.  *See generally* former UNION GAP MUNICIPAL CODE 14.04.010(a), (b) (2004) (adopting the 2003 International Building Code (IBC) and the 2003 International Residential Code (IRC)).

ProBuild's manufacturing process begins with a ProBuild employee inputting truss design parameters, such as dimensions and load requirements,[4] into MiTek's design software. MiTek's software produces a preliminary truss design, including drawings. According to MiTek's agreement with its customers, if the law in the manufacturer's jurisdiction requires an engineer's stamp on the truss designs, then the truss parameter information can be sent to MiTek electronically for further review. A MiTek engineer will then run the design parameters received from the manufacturer through its software and develop the final designs. Because the same software and data are used for both the preliminary and final truss designs, the designs usually end up looking the same. However, since a MiTek engineer develops the final designs from raw data (the engineer does not review the preliminary drawings developed by the manufacturer), MiTek claims its engineers are able to certify their truss designs.

The design certification signed by a MiTek's engineer is accompanied by written explanations of the certification process. A signed and sealed coversheet states:

> The truss drawing(s) referenced below have been prepared by MiTek Industries, Inc. under my direct supervision based on the parameters provided by [ProBuild].

---

[4] The load requirements for a truss refer to the truss's weight-bearing capacity. The appropriate load for a truss can be dictated by either minimum building code requirements (which vary from jurisdiction to jurisdiction) or the unique requirements of a building plan.

. . . .

> The seal on these drawings indicate acceptance of professional engineering responsibility solely for the truss components shown. The suitability and use of this component for any particular building is the responsibility of the building designer, per ANSI/TPI-2002[5] Chapter 2.

CP at 830.

In addition to the explanation set forth on the cover sheet, the other design pages

bear a warning stating:

---

[5] TRUSS PLATE INST., ANSI/TPI 1-2002: NATIONAL DESIGN STANDARD FOR METAL PLATE CONNECTED WOOD TRUSS CONSTRUCTION (rev. Jan. 2005) (ANSI/TPI). ANSI/TPI establishes minimum requirements for the design and construction of the same type of trusses used in the Schillings' home. There is a dual purpose of ANSI/TPI chapter two: (1) define the standard duties and professional responsibilities of truss manufacturers and designers, owners, building designers, and contractors and (2) provide requirements to the owner, building designer, and contractor on the use of trusses. *Id.* § 2.1. Accordingly, a building owner, designer, or contractor (not the truss manufacturer or designer) is primarily responsible for all matters of structural system design, including the determination of truss dead loads and live loads. *Id.* §§ 2.3, 2.4, 2.5, 2.5.2. The truss manufacturer is to rely on the information provided, in writing, by the building owner, designer, or contractor, and the structural design documents created by the building designer or contractor. *Id.* §§ 2.5.2, 2.7.5. The truss designer/engineer is responsible for only the singular element of truss design and is entitled to rely on truss design criteria supplied by the owner, building designer, or contractor. *Id.* § 2.8. At the time the Schillings' home was constructed, both state and local law referenced and incorporated the ANSI/TPI. LAWS OF 2003, ch. 291, § 2 (State Building Code Act, chapter 19.27 RCW, adopting the IBC and IRC, both of which reference and incorporate ANSI/TPI); former UNION GAP MUNICIPAL CODE 14.04.010(a), (b) (2004); IBC §§ 2303.4 ("as required by [ANSI/]TPI"), 2306.1 (ANSI/TPI as standard); IRC §§ R106.1, R802.10.2 ("[D]esign and manufacture of . . . trusses shall comply with ANSI/TPI.").

> *WARNING—Verify design parameters and READ NOTES ON THIS AND INCLUDED MITEK REFERENCE PAGE MII-7473 BEFORE USE.* Design valid for use only with MiTek connectors. This design is based only upon parameters shown and is for an individual building component. Applicability of design parameters and proper incorporation of component is responsibility of building designer—not truss designer.

CP at 831.

When Mr. Brooks initiated the truss design process for the Schillings' home, he referenced the house design plan supplied to him by Artisan. The plan did not enumerate the load requirements for the roof trusses. Instead, Mr. Brooks supplied the information. Mr. Brooks knew the Schillings' home design plan specified it should allow a "load roof for tile." CP at 2795. Also, because Mr. Brooks knew Artisan planned to use high-end tiles, his preliminary truss design specified that the Schillings' home should be able to bear a "15-pound dead load." *Id*. at 473.[6] This specification would have been designated with the abbreviation 15 TCDL.[7]

Pursuant to ProBuild's standard procedure, Mr. Brooks's initial truss designs were reviewed by a plant supervisor, Dennis Suttle. It was Mr. Suttle's job to ensure designs comported with local code requirements. But according to Mr. Brooks, Mr. Suttle also

---

[6] A dead load refers to a permanent load, such as the weight of the building materials. This is contrasted with a live load, which refers to transitory loads imposed by building occupants or moveable objects.

[7] Top chord dead load.

had a practice of changing design specifications to reduce costs. For example, Mr. Suttle would typically lower the TCDL for tile roofs from 15 pounds per square foot to 12. According to Mr. Suttle, many tile roofs are fully supported by a TCDL of 12. Consistent with Mr. Suttle's standard practice, the TCDL for the Schillings' home was lowered from 15 to 12 as a result of revisions made by Mr. Suttle.

ProBuild's final design parameters were eventually sent to MiTek for an engineer's certification. However, ProBuild did not wait for MiTek's certification to begin truss construction. Instead, ProBuild began manufacturing the trusses pursuant to the MiTek software's preliminary designs.

The truss designs for the Schillings' residence were certified by a MiTek engineer on June 1, 2007. Artisan received the certified designs a few days later. Each drawing in the certified truss design includes the parameters used to develop the trusses. Important to this case, each of the 59 drawings in the certified truss design for the Schillings' residence denotes the truss has a dead load capacity of 12 pounds per square foot (12 TCDL). The certified truss design for the Schillings' residence also bore MiTek's standard language regarding the limited nature of the certification and the warning regarding use.

When James and Josh Sevingny received MiTek's certified truss design from ProBuild, they did not review the document in any detail. Both men simply observed the papers contained an engineer's stamp. They then presented the certified design to the Union Gap Building Department examiner for approval. Although, James Sevingny knew back in 2007 that "[t]ypically a tile roof has 15 [TCDL]," CP at 3119, he did not notice that the trusses had been designed with a TCDL of 12 instead of 15. Nothing in the record indicates that either of the Sevingnys or anyone associated with the Schillings ever believed that a TCDL of 12 would have actually been appropriate for the Schillings' home.[8]

James and Josh Sevingny both explained they did not think it was their responsibility to verify that ProBuild's trusses met the design of the Schillings' home or code requirements. According to Josh Sevingny, he expected the truss manufacturer to know what kind of loading is required for a particular house by virtue of the house's location and design plans. James Sevingny explained he believed the engineer responsible for certifying the truss designs would have ensured the trusses met local building codes, local snow loads, and the terms of the building plans. He also believed

---

[8] To the contrary, the Schillings and Artisan have argued that they contracted for a TCDL of 15.

8

the local building official would, prior to final approval, make sure the truss designs met "the contract requirements." CP at 2802.

The Schillings moved into their home in the spring of 2008. Although a tile roof had been contemplated for the home, the final structure bore a composite roof. The Schillings' plan was to eventually replace the composite roof with tile, but a composite roof was used in the interim to reduce costs.

Shortly after the Schillings moved into their home they noticed cracks had formed in their garage ceiling. Artisan initially repaired the cracks, but they continued to reappear. After a couple of years, Artisan began to suspect there was a problem with the trusses.

Artisan contacted ProBuild about the cracks in the Schillings' ceiling and a ProBuild representative came out to the home for an inspection. However, the problem was not resolved. Artisan then contacted Tim Bardell, an engineer who had been involved in the design of the Schillings' residence. Mr. Bardell prepared an engineering report, dated April 18, 2011, that concluded the trusses used at the residence did not meet industry standards. Important to this case, Mr. Bardell concluded the trusses were not designed to bear the type of tile roof contemplated by the Schillings.

Mr. Bardell's report was sent to Artisan and also supplied to ProBuild and MiTek. In order to address concerns raised in the report, representatives from ProBuild and MiTek met with Mr. Bardell, the Schillings and James Sevigny at the Schillings' home on May 23, 2011. During this meeting, James Sevigny felt the MiTek representative was trying to convince everyone that Mr. Bardell's report was wrong and the cracks were not attributable to the trusses. Nevertheless, despite this apparent pressure, there is no indication that ProBuild or MiTek tried to confuse the Schillings or Artisan about the limited weight bearing capacity of a 12 TCDL truss. Because the Schillings had not yet installed a tile roof, the parties' debate over the cause of the ceiling cracks had nothing to do with the fact that the trusses were designed with a TCDL of 12 rather than 15.

Although James Sevigny thought the ProBuild and Mitek representatives were trying to mislead the Schillings and Artisan about the cause of the ceiling cracks, there was no sign they were actually misled. Mr. Bardell never changed his position regarding the trusses. The Schillings also were not placated. They hired a second engineer named Terry Powell to review the problem. Mr. Powell largely concurred with Mr. Bardell's analysis. Of particular significance to this litigation, Mr. Powell agreed the trusses on the Schillings' home were not designed to hold a tile roof.

On February 16, 2012, the Schillings and Artisan (the Plaintiffs) initiated suit against ProBuild and MiTek (the Defendants). The Plaintiffs alleged violations of the Consumer Protection Act (CPA), chapter 19.86 RCW, and breach of express and implied warranties under the Uniform Commercial Code—Sales (UCC), chapter 62A.2 RCW. In brief, the Plaintiffs contended (1) the roof trusses were defective because they were not designed to accommodate a sufficient load for the type of tile roof planned for the residence, and (2) the certified truss designs supplied by MiTek were inadequate because they were not signed by an engineer who had verified the appropriateness of the parameter information (such as load capacity) used to design the trusses.

## ANALYSIS

The Plaintiffs' claims are all governed by a four-year statute of limitations. RCW 19.86.120 (CPA); RCW 62A.2-725(1) (UCC). Because the Plaintiffs' complaint was filed more than four years after the receipt of the Defendants' trusses and certified truss designs, we must assess whether there is a basis for delaying the accrual of these claims. Our review, under the applicable summary judgment standard, is de novo. *Hisle v. Todd Pac. Shipyards Corp.*, 151 Wn.2d 853, 860, 93 P.3d 108 (2004); *Shepard v. Holmes*, 185 Wn. App. 730, 741, 345 P.3d 786 (2014).

*CPA claims*

The CPA's four-year statute of limitations "begins to run when a party has the right to apply to a court for relief." *O'Neil v. Estate of Murtha*, 89 Wn. App. 67, 69-70, 947 P.2d 1252 (1997). A party has the right to apply to a court for relief "when the plaintiff can establish each element of the action." *Hudson v. Condon*, 101 Wn. App. 866, 874, 6 P.3d 615 (2000).

The discovery rule, an exception to the general rule of accrual, can apply to CPA claims. *Shepard*, 185 Wn. App. at 740; *Pickett v. Holland Am. Line-Westours, Inc.*, 101 Wn. App. 901, 913, 6 P.3d 63 (2000), *rev'd on other grounds*, 145 Wn.2d 178, 35 P.3d 351 (2001). Where the discovery rule applies, "a cause of action accrues when the plaintiff, through the exercise of due diligence, knew or should have known the basis for the cause of action." *Green v. Am. Pharm. Co.*, 86 Wn. App. 63, 66, 935 P.2d 652 (1997), *aff'd*, 136 Wn.2d 87, 960 P.2d 912 (1998).

The Plaintiffs' first claim is that the Defendants' trusses were not designed with appropriate load specifications for a tile roof. We therefore ask when the Plaintiffs knew, or with due diligence should have known, that the Defendants' trusses were inadequate. There is no dispute that the Plaintiffs did not actually know the loading information was inadequate until shortly before filing suit. So the real question is what the Plaintiffs

12

should have known and when they should have known it.

The record readily supports the trial court's conclusion that the Plaintiffs, through James Sevigny, should have known about the load limitations of the trusses on the day the certifications were delivered in early June 2007. James Sevigny admitted in his deposition that the type of tile roof planned for the Schillings' residence typically would call for trusses with a TCDL of 15. Yet each drawing in MiTek's certified truss designs plainly states the TCDL for every truss is 12. Had James Sevigny simply read the paperwork provided to him, he would have been alerted to the problem with the trusses on the date of the delivery. Accordingly, the discovery rule provides no basis for delaying accrual of Plaintiffs' claims regarding insufficient load parameters.[9] *Giraud v. Quincy Farm & Chem.*, 102 Wn. App. 443, 449, 6 P.3d 104 (2000) ("To invoke the discovery rule, the plaintiff must show that he or she *could not have* discovered the relevant facts earlier.") (emphasis added).

---

[9] Even if Mr. Sevigny had not understood that a 12 TCDL truss was inadequate for a tile roof (a claim in tension with the Plaintiffs' argument that the 15 TCDL was "contract correct," Appellants'/Cross Resp'ts' Reply Br. at 1) the clear warnings on MiTek's certified truss design advised the parameters needed to be verified, as the truss design was based only on parameters provided by ProBuild, not any particular building. Had Mr. Sevigny read MiTek's warning and engaged in due diligence by checking the parameter information, he would have quickly known the trusses were not designed to bear a 15 pound tile roof.

The Plaintiffs also claim the MiTek engineer's truss design certification was inadequate because the engineer who certified the designs never assessed whether the load parameters used to design the Schillings' trusses were appropriate for the Schillings' residence. But again, this information was plainly disclosed on the truss certification paperwork. The certifications supplied by MiTek stated in nontechnical language that MiTek's truss designs were based solely on parameter information provided by ProBuild. The certification also made explicit that MiTek's engineer had not assessed the suitability of its truss designs for any particular building. Although the certification noted the truss designs had been prepared in reference to the Schillings' property in Yakima County, this notation of purchaser information did not in any way suggest that, contrary to MiTek's warning, an engineer had verified the appropriateness of the designs for the Schillings' particular residence.[10] Had Plaintiffs read the paperwork provided to them by MiTek in early June 2007, they would have known MiTek's engineer had not verified the "suitability and use" of its truss design for the Schillings' residence. CP at 830. Given

___

[10] This limitation is readily apparent from the face of the certification. It is further underscored by the certification's reference to the ANSI/TPI. As set forth in Note 5, *supra*, the ANSI/TPI clearly states the responsibility for determining appropriate truss load criteria falls on the building's owner, designer, or contractor, not the building's truss manufacturer or designer.

this circumstance, the discovery rule also does not apply to delay Plaintiffs' claims with

respect to MiTek's design certification.

*UCC breach of warranty claims*

The UCC's four-year statute of limitations is stricter than the CPA's. Generally,

the statute of limitations will begin to run on delivery of goods, regardless of whether a

plaintiff knew or should have known about a cause of action. RCW 62A.2-725(2);

*Kittitas Reclamation Dist. v. Spider Staging Corp.*, 107 Wn. App. 468, 472, 27 P.3d 645

(2001). However, RCW 62A.2-725(4) provides that the statute does not alter the law on

the tolling of the statute of limitations. Thus, the doctrine of fraudulent concealment has

been found to apply to RCW 62A.2-725. *Giraud*, 102 Wn. App. at 455.

The Plaintiffs do not dispute the fact they received the engineer-stamped truss

designs in early June 2007. However, they allege the Defendants concealed that: (1) the

change in the TCDL parameter occurred during ProBuild's preliminary design process,

and (2) ProBuild, rather than MiTek, had prepared the truss designs and MiTek illegally

plan stamped them. The Plaintiffs maintain these actions tolled the commencement of the

statute of limitations until they discovered this information.

Plaintiffs' analysis misses the mark. As noted above, the Defendants have never

concealed the actual load information used to design the Plaintiffs' trusses or the way in

which MiTek's engineers sign their certifications. Thus, the Plaintiffs had all the information necessary to file their complaint well within the statute of limitations period. *Giraud*, 102 Wn. App. at 455 (no fraudulent concealment when warning label gave plaintiffs sufficient access to information).

The Plaintiffs claim the Defendants engaged in fraudulent concealment when both MiTek and ProBuild disavowed any connection between the cracking in the Schillings' ceiling and their truss designs. The record does not support this position. It is apparent the Plaintiffs were never convinced by the Defendants' causation analysis. They continued to investigate the possibility of problems with the trusses despite the Defendants' assurances otherwise.

The Defendants' proffer with respect to fraudulent concealment is also inapposite. The allegedly fraudulent causation analysis of the Defendants for the ceiling cracks is unrelated to the Plaintiffs' breach of warranty claims. The damages allegedly suffered as a result of the Defendants' breach of warranty were the inability to install a tile roof and the reduced property value due to the possibility the truss design certification did not comply with local code; they had nothing to do with the Schillings' cracked ceiling. Nothing about the Defendants' conduct or ceiling crack analysis prevented the Plaintiffs

from recognizing their breach of warranty claims within the statute of limitations period and filing suit.

Because the Defendants never concealed the operative facts that would have permitted the Plaintiffs to file their breach of warranty claims within the limitations period, equitable tolling provides the Plaintiffs no relief from the Defendants' statute of limitations argument.

## CONCLUSION

We affirm the trial court's April 15, 2016, order granting summary judgment to the Defendants based on the statute of limitations. All previous summary judgment orders issued by the superior court are vacated. We pass no judgment on the validity of any other superior court orders entered prior to the final order on summary judgment.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Pennell, A.C.J.

WE CONCUR:

_____
Korsmo, J.

_____
Fearing, J.

17